66 A.3d 253

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Rasheed SIMPSON, Appellant.**

Supreme Court of Pennsylvania.

Submitted June 3, 2008.

Decided March 26, 2013.

62

64

Louis M. Natali Jr., Turner & McDonald, P.C., Philadelphia, for Rasheed Simpson.

Hugh J. Burns Jr., Philadelphia District Attorney's Office, Philadelphia, Amy Zapp, PA Office of Attorney General, Harrisburg, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice TODD.

In this capital case, Rasheed Simpson appeals the order of the Philadelphia County Court of Common Pleas dismissing without a hearing his petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541–46. We affirm in part, vacate in part, and remand for further proceedings as directed.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A. Factual Background

We recited the facts in support of Appellant's conviction at length in his direct appeal. *Commonwealth v. Simpson*, 562 Pa. 255, 259–63, 754 A.2d 1264, 1266–68 (2000). Accordingly, we reiterate here only those facts necessary for a proper understanding of Appellant's claims.

On the evening of December 8, 1993, Appellant and three confederates, Allister Durrante, Malik Bowers, and an unidentified man, abducted Andrew Haynes ("Haynes" or "the victim"), a minor drug dealer also known as "The Dread" because he wore his hair in dreadlocks, from near the intersection of 18th and Tioga Streets in North Philadelphia. They forced Haynes into a van and drove him to an apartment where their friend, Raheema Washington, resided. There, they beat the victim and demanded he give them money. After Washington expelled them from her apartment, Appellant spoke with Aloysius Hall and Haynes' brother Selvan on the phone, and demanded $20,000 within 15 minutes. If he and his confederates were not paid, Appellant threatened, they would kill Haynes. *See* N.T., 12/11/97, at 21 (Aloysius Hall's testimony that the kidnapper said he "needs $20,000 in 15 minutes or the Dread is dead"). After repeated phone calls between the kidnappers and Haynes' family, Haynes was killed by four bullets to the back of his head. His body was found in a vacant lot at 18th and Somerset Streets in North Philadelphia.

Appellant was not arrested until July 1996, after Washington gave a statement to the police implicating him in the crime. He was charged with murder in the first degree, kidnapping, robbery, conspiracy, and possession of an instrument of crime. He then proceeded to a jury trial jointly with one of his co-conspirators, Malik Bowers.[1]

At trial, the evidence connecting Appellant to the crime was as follows. First, Washington testified that Appellant had been in the group of kidnappers who brought the victim to her apartment on the evening of December 8, 1993. N.T.,

1. Durrante was tried separately and convicted of second-degree murder, kidnapping, robbery, conspiracy, and related charges.

12/12/97, at 13–18. Second, Hall testified that the kidnapper who spoke with him on the phone referred to a robbery against Hall which Appellant had committed and, when Hall responded by asking "if it [was] Rasheed?" the kidnapper responded affirmatively. N.T., 12/11/97, at 21. Third, a week after the murder, Montgomery County Police Officer James Slavin investigated a car which lacked a license plate in the parking lot of the Cheltenham Mall in Cheltenham, Pennsylvania, and discovered a firearm. After Officer Slavin and other officers staked out the car, Bowers, Washington, and others returned to the car; Bowers refused to cooperate with officers and was arrested. Officer Slavin's notes identify the other passengers as Washington, Cameron Thompson, Will Shepard, and the driver, Medeya Clark. *Id.* at 112–13. However, none presented identification, and Washington testified that Appellant was one of the passengers. N.T., 12/12/97, at 26.[2] Appellant's theory of the case was that he was not involved in the crime.

On December 17, 1997, Appellant and Bowers were both convicted of the aforementioned charges. At the joint penalty phase hearing, the Commonwealth cited three statutory aggravating factors in arguing that a capital sentence was appropriate: Haynes had died while being held for ransom; Appellant had a significant history of violent felony convictions; and Appellant had been convicted of another homicide.[3] *See* 42 Pa.C.S.A. §§ 9711(d)(3), (9), (11). Appellant argued a capital sentence was inappropriate because of his age, his character, and the circumstances of the crime. *See* 42 Pa.C.S.A. §§ 9711(e)(4), (8). On December 22, 1997, the penalty-phase jury determined the Commonwealth had established all three aggravating factors listed above. The jury considered Appel-

2. Officer Slavin testified that he would not recognize any of the participants in the incident except for Bowers. N.T., 12/11/97, at 142.

3. On January 13, 1995, Appellant was convicted of third-degree murder and other crimes in the shooting death of Darnell Carraway. He was subsequently sentenced to 10 to 20 years imprisonment. The Superior Court affirmed in an unpublished opinion, *Commonwealth v. Simpson,* 776 A.2d 295 (Pa.Super.2001) (table), and we denied allowance of appeal, *Commonwealth v. Simpson,* 566 Pa. 661, 782 A.2d 544 (2001) (order).

lant's age as a mitigating factor[4], but determined the three aggravating factors outweighed that mitigating factor and, thus, sentenced him to death.

Subsequent to Appellant's initial conviction, we heard his direct appeal and affirmed both his conviction and his judgment of sentence. *Simpson, supra.* In so doing, we rejected Appellant's challenges to the weight and sufficiency of the evidence offered to support his conviction; the admission of a witness' statement about Appellant's alleged propensity for violence; the capital murder instruction offered to the jury; the prosecuting attorney's penalty-phase inquiry regarding the possibility Appellant would eventually receive a pardon; and the prosecuting attorney's guilt-phase summation characterizing the murder of Haynes as an "execution." Appellant's trial counsel continued to represent him on direct appeal.

■ Appellant filed a pro se petition for relief under the PCRA on September 17, 2001. Counsel was appointed and filed an amended petition on July 9, 2002, and a supplemental amended petition on January 29, 2003. The Commonwealth filed a motion to dismiss on June 24, 2004. Appellant filed a reply on April 12, 2005, and, on October 18, 2005, the PCRA court granted the Commonwealth's motion without a hearing, concluding Appellant's petition raised no genuine issues of material fact.[5] The instant appeal followed.[6]

In its opinion explaining its dismissal of Appellant's petition without a hearing, the PCRA court denied relief as to all 15 of the arguments Appellant presses in the instant appeal, as well as one argument which Appellant appears to have abandoned.[7]

4. Appellant's mother testified Appellant was 23 years old at the time of trial. N.T., 12/18/97, at 122.

5. The Honorable David N. Savitt presided over Appellant's trial and authored the opinion dismissing Appellant's PCRA petition.

6. This Court has jurisdiction over direct appeals from orders denying PCRA relief in capital cases. 42 Pa.C.S.A. § 9546(d). Our standard of review requires that we defer to the PCRA court's findings where they are supported by the record and are free of legal error. *Commonwealth v. Dennis,* 597 Pa. 159, 166 n. 1, 950 A.2d 945, 949 n. 1 (2008).

7. Appellant has abandoned on appeal his challenge to the "no adverse inference" instruction given at trial. The PCRA court rejected this

We discuss the PCRA court's rationales below.[8]

## B. Legal Background

Before turning to the merits of the 15 issues raised by Appellant on appeal, as several of his claims concern ineffective assistance of counsel, we begin with a summary of the legal framework governing PCRA petitions raising such claims. As noted above, Appellant's trial counsel continued to represent him on direct appeal. Accordingly, though Appellant's direct appeal was litigated prior to our decision in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), Appellant did not have an opportunity to raise claims of trial counsel's ineffectiveness on direct appeal. In this context, the proper framework in which to consider Appellant's issues is the "performance and prejudice" analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and *Commonwealth v. Pierce*, 515 Pa. 153, 157, 527 A.2d 973, 975 (1987).

claim, noting Appellant had not proven prejudice, and was nonetheless aware such an instruction would be provided.

8. We have expressed concern that PCRA courts conduct a thorough analysis of the legal issues in a capital case to "enable us to conduct meaningful review." *Dennis*, 597 Pa. at 179–80, 950 A.2d at 956–57; *see also Commonwealth v. McGill*, 574 Pa. 574, 593, 832 A.2d 1014, 1026 (2003). Here, as in *Dennis*, the PCRA court's opinion is incomplete, often reciting conclusions without supporting legal analysis. *See, e.g.*, PCRA Court Opinion, 11/28/05, at 6 (dismissing Appellant's allegation that his investigator suffered from a conflict of interest because Appellant "has not shown that he was prejudiced by his investigator's dual representation," without providing any justification for the conclusion that Appellant had failed to make such a showing). We recognize the demands placed on reviewing courts. However, our concern for completeness is not merely formal; rather, we defer to the PCRA court's resolution of the issues before us unless that resolution is infected with legal error or unsupported by the record. Where, as here, we are not provided with findings of fact or robust legal analysis, it is far more difficult to discern whether the trial court has correctly construed the record or committed an error of law. Accordingly, we are effectively forced either to conduct review of a voluminous record unguided by findings of fact below, as we did in *Dennis*, or to remand the matter if such review is impracticable, as we did in *Commonwealth v. Daniels*, 600 Pa. 1, 963 A.2d 409 (2009). Here, as in *Dennis*, we review the matter. Nevertheless, we caution the lower courts that this situation often results in remand, wasting judicial resources and litigants' time.

 The defendant's right to counsel guaranteed by the Sixth Amendment to the United States Constitution and Article I, § 9 of the Pennsylvania Constitution is violated where counsel's performance "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." *Commonwealth v. Rios*, 591 Pa. 583, 600, 920 A.2d 790, 799 (2007) (internal quotation marks omitted). In this regard, we apply a three-pronged test for determining whether trial counsel was ineffective, derived from our application in *Pierce*, 515 Pa. at 157, 527 A.2d at 975, of the performance and prejudice test articulated by the United States Supreme Court in *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. The *Pierce* test requires a PCRA petitioner to prove: (1) the underlying legal claim was of arguable merit; (2) counsel had no reasonable strategic basis for his action or inaction; and (3) the petitioner was prejudiced—that is, but for counsel's deficient stewardship, there is a reasonable likelihood the outcome of the proceedings would have been different. *Pierce*, 515 Pa. at 158–59, 527 A.2d at 975. If a petitioner fails to prove any of these prongs, his claim fails. *Commonwealth v. (Christopher) Williams*, 594 Pa. 366, 378, 936 A.2d 12, 19–20 (2007). Moreover, counsel is presumed to be effective, and a petitioner must overcome that presumption to prove the three *Strickland/Pierce* factors. *Commonwealth v. Singley*, 582 Pa. 5, 19, 868 A.2d 403, 411 (2005).

 Where a PCRA petition does not raise a "genuine issue[ ] of material fact," the reviewing court is not required to hold an evidentiary hearing on the petition. *Commonwealth v. Clark*, 599 Pa. 204, 212, 961 A.2d 80, 85 (2008); Pa. R.Crim.P. 909(B). Thus, to entitle himself to a hearing, an appellant must raise an issue of fact, which, if resolved in his favor, would justify relief. *Commonwealth v. D'Amato*, 579 Pa. 490, 513, 856 A.2d 806, 820 (2004) (citations omitted). Here, the PCRA court concluded Appellant's petition raised no genuine issues of material fact, and so dismissed it without a hearing. We review this determination for an abuse of discretion. *Commonwealth v. (Ronald) Collins*, 585 Pa. 45, 70, 888 A.2d 564, 579 (2005).

## II. DISCUSSION

Initially, we consider the Commonwealth's arguments, offered throughout its brief, that Appellant does not adequately state or develop his claims and allegations of ineffectiveness, and, accordingly, those allegations are waived.[9] The Commonwealth asks us to conclude that most of Appellant's allegations of ineffectiveness are, essentially, boilerplate claims of ineffectiveness. The Commonwealth asserts that this is inadequate to support our review of the merits of the ineffectiveness claim.

The PCRA court did not endorse or even discuss the Commonwealth's assertions of waiver, and did not engage in any procedural default analysis. A judge "shall" order amendment of a defective PCRA petition, Pa.R.Crim.P. 905(B), thus, we may infer the PCRA court did not agree that the instant petition or advocacy was inadequate. Therefore, in this matter, we decline to find waiver based on any alleged inadequacies. Accordingly, we proceed to consider Appellant's claims for relief.

### A. Appellant's *Batson* Claim

Appellant asserts the Commonwealth violated his rights under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), by utilizing its peremptory challenges in a manner which discriminated against African–Americans [10] and women, and that his trial counsel was ineffective for failing to challenge the Commonwealth's allegedly discriminatory use of its peremptory challenges. To show a *Batson* violation, an appellant must generally demonstrate his particular factual situation satisfies the well established test laid out by the United States Supreme Court's opinion in that case: First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis

9. The Commonwealth seemingly blends its assertions regarding defects in Appellant's petition and briefing. *See, e.g.,* Brief for the Commonwealth at 10–11, 13.

10. Appellant is African–American.

of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for his peremptory challenges. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 96–98, 106 S.Ct. 1712.[11]

However, where, as here, a *Batson* claim arises only in the context of an allegation of ineffective assistance of counsel, years after the voir dire is conducted, the defendant is not entitled to the benefit of the burden of persuasion as to whether there is a race-neutral explanation for the prosecutor's use of peremptory challenges. *Commonwealth v. Uderra*, 580 Pa. 492, 511–12, 862 A.2d 74, 86 (2004). Rather, the defendant bears the burden throughout the inquiry and must demonstrate "actual, purposeful discrimination by a preponderance of the evidence," as well as meeting the "performance and prejudice" standard for demonstrating counsel's ineffectiveness noted above. *Uderra*, 580 Pa. at 513, 862 A.2d at 87; *Commonwealth v. Jones*, 597 Pa. 286, 292–97, 951 A.2d 294, 298–301 (2008).

To satisfy his burden, a defendant raising a *Batson* claim must "make an adequate record specifically identifying the race of all the venirepersons who had been removed by the prosecution, the race of the jurors who served, or the race of jurors acceptable to the Commonwealth who had been stricken by the defense," since otherwise we lack an adequate record upon which to evaluate the *Batson* claim. *Commonwealth v. Spence*, 534 Pa. 233, 247, 627 A.2d 1176, 1182–83 (1993).

11. In this regard, Appellant's reliance on the framework for discriminatory jury selection laid out in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), requiring a defendant to show a pattern of discrimination by a prosecutor's office, is somewhat misguided. The United States Supreme Court's decision in *Batson* overruled *Swain*, in part, such that a defendant no longer has to show a systematic pattern of discrimination in order to establish an equal protection violation, but need only show it in his own individualized case. *See Batson*, 476 U.S. at 93, 106 S.Ct. 1712; *Commonwealth v. Cook*, 597 Pa. 572, 604 n. 15, 952 A.2d 594, 613 n. 15 (2008). That said, under *Swain*, a defendant may still make a generalized claim of systematic exclusion.

■ Here, Appellant has provided the necessary information under *Spence*. *See* Brief for Appellant at 15–17; Appendix at 144–50. Thus, we consider "whether Appellant's proffer, if believed, would establish actual, purposeful discrimination," mindful that "it is exponentially more difficult [in the PCRA context] to perform a reasoned assessment concerning the presence or absence of purposeful discrimination." *Uderra*, 580 Pa. at 513–14, 862 A.2d at 86–87.[12]

■ Appellant points out that, of the Commonwealth's 18 peremptory challenges, 13 were used on African–Americans, and 11 on women; African–Americans made up only 42% of the venire pool but 72% of the Commonwealth's challenges, while whites made up 53% and 27%, respectively. Further, Appellant argues in several cases the Commonwealth struck one venireperson and not another, and Appellant alleges that the only difference between the two was race. Appellant provides 3 specific examples. In a fourth case, Appellant argues the Commonwealth conducted only a "perfunctory" voir dire before striking a juror. Appellant avers the Commonwealth's actions were consistent with those recommended on the infamous McMahon tape[13], and that his trial counsel was ineffective in failing to raise and litigate the issue at trial and on direct appeal. Finally, Appellant asserts the trial court erred in issuing a conclusory determination that no *Batson* violation occurred on the basis that six African–Americans appeared on the jury.[14] *See* PCRA Court Opinion,

12. We are, however, equally mindful that "direct evidence of intentional discrimination is hard to come by." *Commonwealth v. Basemore*, 560 Pa. 258, 284, 744 A.2d 717, 732 (2000) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 271, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring)).

13. On this tape, made in 1986 and released in 1997, former prosecutor Jack McMahon advocates a racially discriminatory approach to voir dire, including recommending several pretexts with which to disguise the use of racially discriminatory peremptory strikes. We have summarized in detail, and strongly condemned, the practices advocated on the McMahon tape. *See Basemore*, 560 Pa. at 283 n. 12, 744 A.2d at 731 n. 12 (2000).

14. The PCRA court rejected Appellant's claim, noting that the jury was evenly divided by race and concluded that, accordingly, Appellant's underlying claim was meritless. In so holding, the PCRA court relied

11/28/05, at 5. While Appellant's *Batson* claim itself is waived, his derivative claim that his trial counsel was ineffective for failing to contest the above errors is cognizable under the PCRA. *See Commonwealth v. Hackett*, 598 Pa. 350, 364 n. 15, 956 A.2d 978, 986 n. 15 (2008).

With respect to the McMahon contention, we have repeatedly emphasized that the McMahon training tape does not suffice to demonstrate a *Batson* violation in a particular case, particularly where, as here, "the prosecutor at an appellant's trial was someone other than McMahon, and the time of the appellant's trial was temporally remote from the creation of the videotape." *Jones*, 597 Pa. at 303, 951 A.2d at 305. Here, Appellant was brought to trial more than ten years after the McMahon tape was created, and the prosecutor was not McMahon. Thus, the McMahon tape is inadequate to demonstrate actual, purposeful discrimination.

The remainder of Appellant's proffer—one instance of perfunctory voir dire of a juror the Commonwealth struck, a greater percentage of strikes used against African–American jurors than whites, and three cases where the Commonwealth struck African–American jurors but did not strike white jurors with some common characteristics—is similarly inadequate to prove actual, purposeful discrimination by a preponderance of the evidence. The Commonwealth was entitled to 20 peremptory challenges, *see* 234 Pa.Code § 634, which it did not exhaust even though numerous minorities and female jurors remained in the venire pool. This militates against finding even a prima facie case for a *Batson* violation, let alone "actual, purposeful discrimination." *See Commonwealth v. Hardcastle*, 519 Pa. 236, 245, 546 A.2d 1101, 1105 (1988).

on our decision in *Commonwealth v. Harris*, 572 Pa. 489, 817 A.2d 1033 (2002). *Harris* stated no such proposition; instead, in *Harris*, we considered a situation where the claimant was *presumed* to have met his burden of offering a prima facie case of discrimination, but concluded the prosecutor had offered a sufficient race-neutral reason to demonstrate no intentional discrimination existed. *Id.* at 509–10, 817 A.2d at 1044–45.

■■■■■ Appellant's argument that the Commonwealth violated *Batson* by its decision to strike venirepersons Juanita Martin, Paula Smith, and Valerie Lipford similarly fails to demonstrate actual, purposeful discrimination. Appellant asserts that the Commonwealth struck Martin for equivocating about her willingness to impose the death penalty, but did not strike white juror Patricia Anick for expressing similar hesitation. Moreover, Appellant asserts the Commonwealth struck Smith and Lipford, while not striking white venireperson Joanne Hehn, even though all three had family members in the penal system shortly before the trial in this case.

As the Commonwealth points out, however, the venirepersons in question were different in other, arguably material, ways. Most tellingly, both Anick and Hehn had family members in law enforcement, which could have legitimately provided a race-neutral reason for the prosecutor to choose not to challenge them even though a venireperson's equivocation about her ability to impose capital punishment and a venireperson's having family members with recent criminal convictions constitute legitimate grounds for peremptory challenges. Accordingly, we find no evidence of "actual, purposeful discrimination" here.

Finally, Appellant asserts the Commonwealth conducted a perfunctory voir dire of venireperson Janice Jones, asking only three questions. Under *Morse v. Hanks*, 172 F.3d 983, 985 (7th Cir.1999), he avers such a perfunctory voir dire followed by a peremptory challenge suggests discrimination.

■■■■ However, the prosecutor's voir dire of Jones covered seven exchanges and approximately two complete pages in the transcript, N.T., 12/3/97, at 71–73, which was not unusually brief.[15] Moreover, as the Commonwealth argues, Jones twice could have been reasonably construed to express impatience with the prosecutor's voir dire during that brief period, *see id.* at 72, on the basis of which the prosecutor could reasonably and for race-neutral reasons have decided to strike Jones.

15. *Compare, e.g.*, N.T., 12/3/97, at 90–93 (three page *voir dire* by the prosecutor), 103–105 (three page *voir dire* by the prosecutor).

Under such circumstances, Appellant cannot show "actual, purposeful discrimination" on the basis of one admittedly brief voir dire followed by a peremptory challenge. *See Morse,* 172 F.3d at 985 (suggesting in dicta that a perfunctory *voir dire* would not establish even a prima facie case of discrimination where the excused juror "had given an answer that would expose a clear basis for the state to want to remove him from the pool with a peremptory challenge"). Accordingly, we conclude the PCRA court did not err in dismissing this claim.

## B. Exculpatory or Impeachment Evidence Unavailable at Trial

*1. Brady Claim*

██ Next, Appellant asserts his rights were violated under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[16] Therein, the Supreme Court held that a defendant has a federal constitutional right to receive material exculpatory evidence in the prosecution's possession.

██ To demonstrate a *Brady* violation, Appellant must show that: (1) the prosecution concealed evidence; (2) which was either exculpatory evidence or impeachment evidence favorable to him; and (3) he was prejudiced by the concealment. *Commonwealth v. Paddy,* 569 Pa. 47, 64–65, 800 A.2d 294, 305 (2002); *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). To show prejudice, he must demonstrate a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Clark,* 599 Pa. at 219, 961 A.2d at 89 (internal quotation marks omitted). A reasonable probability for these purposes is one which "undermines confidence in the outcome of the trial." *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

16. A *Brady* claim is cognizable on collateral appeal under the PCRA. *See Commonwealth v. Tedford,* 598 Pa. 639, 689 n. 19, 960 A.2d 1, 30 n. 19 (Pa.2008) (citing 42 Pa.C.S.A. § 9543(a)(2)(vi)).

■ Furthermore, and relevant to the instant claims, *Brady* evidence may not be cumulative of other evidence, *Commonwealth v. Lambert*, 584 Pa. 461, 473, 884 A.2d 848, 856 (2005), cannot have been equally available to the defense, *Commonwealth v. Spotz*, 562 Pa. 498, 526–27, 756 A.2d 1139, 1154 (2000), and cannot have been discoverable through the exercise of reasonable diligence, *Commonwealth v. Sattazahn*, 597 Pa. 648, 680, 952 A.2d 640, 659 (2008).

Appellant asserts three separate *Brady* violations. First, he argues the prosecution understated the victim's criminal record. Second, he avers the prosecution withheld the fact that Commonwealth witness Aloysius "Stanley" Hall had felony charges for distribution of narcotics *nolle prossed* two months before he testified at Appellant's trial. Third, he argues the prosecutor withheld evidence that Tracena Copper was a paid government witness at the time of his trial, and that the Commonwealth was aware at the time of his trial that Copper both used and sold narcotics, but chose not to charge her with any offense.

The PCRA court rejected these claims. The court noted that two pieces of evidence in question—Haynes' arrest for robbery and possession of a controlled substance with intent to deliver, and Commonwealth witness Tracena Cooper's status as a crack dealer and marijuana user—would have been inadmissible, and consequently concluded Appellant could not demonstrate he was prejudiced by the failure to disclose either piece of evidence. The court also rejected Appellant's claim that the Commonwealth violated *Brady* by failing to disclose that Commonwealth witness Stanley Hall had an open drug case, which Appellant alleged was dropped because of Hall's testimony. The court noted Appellant had offered no evidence of such an agreement beyond speculation, and denied the claim.

## a. The Victim's Criminal History

Initially, Appellant argues that the Commonwealth suggested the victim was a marijuana dealer, when in fact the victim also dealt crack cocaine. Moreover, he avers that, at the time

of the crime, the victim was facing charges for a variety of felonies, including robbery, aggravated assault, possession of a controlled substance with intent to deliver, and conspiracy. The Commonwealth, he asserts, withheld this evidence, which would have cast doubt on the Commonwealth's theory that Appellant killed the victim because he did not have any money. Appellant further notes that evidence the victim sold crack would have buttressed a statement by another witness to police that there was a lot of conflict among the local drug dealers, including those of Jamaican origin, and so suggested other possible perpetrators.

As the Commonwealth notes, however, Appellant's co-defendant raised the issue of the victim's crack cocaine sales before the jury in the cross-examination of Clayton Duncan and Aloysius Hall. N.T., 12/11/97, at 6–12, 62–63. Thus, the defense and the jury were aware the victim had sold crack cocaine, vitiating any *Brady* concerns because any additional evidence that the victim had sold crack was available to the defense and, regardless, would have been cumulative. *See Lambert, supra.* Accordingly, the PCRA court correctly dismissed this claim without a hearing.[17]

### b. Favorable Treatment for Aloysius Hall

Appellant notes that Hall had felony drug distribution charges pending at the time he originally inculpated Appellant in the instant homicide, and that those charges were *nolle prossed* two months before Hall testified at his preliminary hearing. Appellant avers the Commonwealth was obligated to disclose this information under *Brady*.

The PCRA court found that Appellant proffered "no evidence of a deal between the witness and the police" to exchange testimony in Appellant's trial for favorable treat-

---

17. Moreover, though Appellant forcefully asserts that he could have undermined the Commonwealth's theory that the victim was killed because he did not have the money to pay his ransom through the introduction of evidence that the victim was a crack dealer as well as a marijuana dealer, he provides no evidence that crack dealers are more financially secure than marijuana dealers.

ment, and so he could not demonstrate a *Brady* violation occurred. PCRA Court Opinion, 11/28/05, at 6.

The duty to disclose under *Brady* encompasses impeachment evidence as well as exculpatory evidence. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). However, for a defendant to be entitled to a new trial based on the prosecution's failure to disclose information relating to a witness' credibility, the defendant must "demonstrate that the reliability of the witness may well be determinative of his guilt or innocence." *Commonwealth v. Morales,* 549 Pa. 400, 414, 701 A.2d 516, 523 (1997) (citing *Commonwealth v. Moose,* 529 Pa. 218, 232, 602 A.2d 1265, 1272 (1992)); *see also Giglio,* 405 U.S. at 154, 92 S.Ct. 763.

Here, Hall testified that he recognized Appellant on the phone when the kidnappers called, because Appellant reminded him of a previous robbery Appellant committed against him. He later identified Appellant to police. *See* N.T., 12/11/97, at 22, 64. Accordingly, Appellant avers that Hall's testimony was "critical." Brief for Appellant at 31.

Appellant relies on *Commonwealth v. Strong,* 563 Pa. 455, 761 A.2d 1167 (2000), to challenge the PCRA court's decision. There, we held that "any evidence of an understanding or promise [of leniency] regarding ... testimony" was relevant. *Id.* at 464, 761 A.2d at 1172. Accordingly, he avers, he could have used the evidence that the charges against Hall were dropped two months before his preliminary hearing to cast doubt on Hall's credibility.

However, as the Commonwealth points out, this case is more closely analogous to *Commonwealth v. Champney,* 574 Pa. 435, 832 A.2d 403 (2003). Brief for the Commonwealth at 30. In that case, we held that, where a witness' sentence was reduced and an appellant offered a "mere assumption that something such as a promise to assist in reducing his federal sentence must have been made," *id.* at 450, 832 A.2d at 412, he had not shown a *Brady* violation. *See also Morales, supra.* As Appellant has, like the *Champney* and *Morales* appellants, simply suggested that under the circumstances a deal between

Hall and the Commonwealth "must have been made," without proffering any evidence, the PCRA court correctly dismissed this claim without a hearing.

### c. *Tracena Copper's Status as a Paid Informant*

Appellant avers that Commonwealth witness Tracena Copper was a paid informant with a history of uncharged narcotics offenses, and that the prosecutor inaccurately represented to the contrary. Brief for Appellant at 32–33. Without citation to authority, Appellant asserts the PCRA court erred in concluding that he was not prejudiced because he was aware that Copper was a Commonwealth informant and information about her past use and sale of narcotics would have been inadmissible. Though he again neither refers to nor attempts to meet the *Moose* standard for *Brady* violations in the context of information about a witness' credibility, Appellant asserts that Copper's credibility was "a crucial fact for the jury to weigh" because she testified Appellant had access to a gun she provided his co-defendant, Malik Bowers. *Id.*

Initially, the prosecuting attorney appears only to have averred that Copper was an unpaid informant with respect to this particular case, not globally. *See* N.T., 12/12/97, at 155. The Commonwealth submits that Copper was paid by federal authorities, and Appellant has not shown that information was in the Commonwealth's possession. *See* Brief for Appellant at 32–33 (apparently conflating "the prosecutor," i.e., the Philadelphia District Attorney's office, with "the government," i.e., the United States Attorney's office).

While the prosecution is responsible for ensuring the government's *Brady* responsibilities are met as regards evidence under the control of the police, *Commonwealth v. Burke*, 566 Pa. 402, 781 A.2d 1136 (2001); *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), we have not held Commonwealth prosecutors responsible under *Brady* for information held by federal authorities and Appellant does not provide any justification for doing so here. *See, e.g., Burke*, 566 Pa. at 413, 781 A.2d at 1142 ("[U]nder *Kyles*, the prosecution's *Brady* obligation clearly extends to exculpatory evidence

84

in the files of police agencies of the *same government* bringing the prosecution." (emphasis added)). Indeed, prior to *Burke,* we had issued an "unbroken line of decisions ... holding that the prosecution does not violate Pa.R.Crim.P. 305(B)(1) [18] when it fails to provide the defense with evidence that it does not possess and of which it is unaware." *Id.* at 412, 781 A.2d at 1142. *Burke* noted two elements of *Kyles'* reasoning in displacing our prior precedent as relates to evidence in the files of police agencies: first, that prosecutors have the authority to determine the procedures under which police provide them with evidence, so they have the ability to ensure they are aware of any *Brady* material and avoid accidental violations; and second, that to *de facto* permit police to decide what material to place within the ambit of *Brady* based on what evidence they choose to turn over to prosecutors would "substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials." *Id.* at 413, 781 A.2d at 1142 (quoting *Kyles,* 514 U.S. at 438, 115 S.Ct. 1555). Neither consideration applies in the case of material held by federal prosecutors.

Moreover, Bowers' trial counsel described Copper as a federal informant in sidebar conversations at trial, on the record. N.T., 12/11/97, at 143, 150. Thus, the defense was aware Copper was a federal informant, and any *Brady* violation must be based solely on the fact that the defense was not informed Copper was a *paid* informant. *See Spotz, supra.* Appellant does not establish that this distinction is adequate to satisfy the requirements of *Brady* materiality. Thus, Appellant's *Brady* claims fail.[19]

18. Rule 305 was promulgated to fulfill the requirements of *Brady. Burke,* 566 Pa. at 411, 781 A.2d at 1141. It has been renumbered and is now Pa.R.Crim.P. 573.

19. Appellant includes at this point a somewhat unclear argument about alleged prosecutorial misconduct in another case against him. He does not cast this claim in terms of ineffectiveness or argue it is cognizable under the PCRA and, regardless, he cannot demonstrate prejudice in the instant case through an alleged violation in a different one. Appellant also attempts to support his *Brady* claims by reference to prior allegations of misconduct against the same prosecuting attorney which,

## 2. Allegations that Counsel's Pre–Trial Investigation was Inadequate

Related to his *Brady* claims, Appellant argues that his counsel was ineffective for failing to adequately investigate the case. He argues a diligent investigation would have uncovered the aforementioned *Brady* evidence.[20] However, since Appellant's *Brady* claims fail, his derivative ineffectiveness allegations *ipso facto* lack arguable merit. *Commonwealth v. Tedford*, 598 Pa. 639, 690, 960 A.2d 1, 31 (2008). Accordingly, the PCRA court correctly dismissed this claim without a hearing.

## 3. Miscellaneous Ineffectiveness Claims

Appellant next asserts three allegations of ineffectiveness which are only somewhat related to his *Brady* claims. He argues that his trial counsel was ineffective for failing to request a cautionary instruction concerning Tracena Copper's testimony; for failing to request a bench warrant for the appearance of Felicia Brokenbrough and failing to move for the admission of the entire statement she gave to police; and for failing to explore Raheema Washington's possible motive and bias against Appellant, as well as allegations concerning the failure to present Cameron Thompson as a witness and failure to use information from Thompson to contradict Washington's testimony. Troublingly, the PCRA court addressed none of these allegations. That being the case, we are able to review these claims only if they can be addressed as a matter of law. *Cf. Commonwealth v. Dennis*, 597 Pa. at 181, 950 A.2d

in at least one case, we found to be meritless. *See* Brief for Appellant at 35; *Commonwealth v. Rice*, 568 Pa. 182, 209–13, 795 A.2d 340, 356–58 (2002). We do not countenance Appellant's tactic of trying to prove a constitutional violation by *ad hominem* attack, nor do we consider prior meritless allegations of prosecutorial misconduct at all probative in demonstrating misconduct in the instant case. *See Commonwealth v. Jones*, 590 Pa. 202, 229, 912 A.2d 268, 284 (2006) (deeming a similar argument "irrelevant and not cognizable").

20. If believed, this argument would be fatal to Appellant's *Brady* claims, as where a defendant was aware of *Brady* material or could have uncovered it through the exercise of reasonable diligence, he cannot prove a *Brady* violation. *Sattazahn, supra.*

at 958 (explaining that, regardless of the PCRA court's failure to articulate its basis for rejecting claims, the decision on direct appeal and the record were sufficient to dismiss certain claims on the merits).

First, Appellant avers that the trial court instructed the jury it could not construe Copper's testimony that she acquired a gun for Bowers as substantive evidence of guilt against him, or as evidence of his bad character, but did not caution the jury that it could not construe Bowers' acquisition of the gun as substantive evidence of Appellant's guilt, or as evidence of Appellant's bad character. Brief for Appellant at 37–39. His trial counsel, he suggests, was ineffective for failing to seek such an instruction.

■■■ It is not entirely clear why Appellant believes jurors would have drawn negative inferences about him from his co-defendant's acquisition of a firearm. Moreover, we evaluate the relevant portion of the trial court's charge in context, as a whole, and mindful of the trial court's broad discretion in phrasing jury instructions as well as the principle that unless a particular instruction is fundamentally erroneous or would have "misled or confused the jury" no relief is due. *See Commonwealth v. Wright*, 599 Pa. 270, 315, 961 A.2d 119, 145 (2008). Viewed in that light, Appellant has not shown that the charge was inadequate, and so cannot satisfy *Pierce*.

■■■ The trial court instructed the jury:

Now, members of the jury, you have heard some evidence which tends to prove that the defendants may have been guilty of some improper conduct for which they're not on trial. I think there was some evidence about Malik Bowers being in a car in Cheltenham in December and a purchase of a gun in September, 96—and in the car in December, 93, and the purchase of the gun I think was September, 93. There is also testimony about Rasheed Simpson involving an incident six weeks prior in—with Stanley Hall. Whatever. The evidence of this conduct was before you for a limited purpose, and that's simply to tend to show the motive, the plan, the means of this crime.

This evidence must not be considered by you in any way other than for the purpose I just stated. You must not regard this evidence as showing that *the defendants* are persons of bad character or criminal tendencies from which you might be inclined to infer guilt. Should you find the defendants guilty of any charges, it must be because you're convinced by the evidence that they committed the crimes charged and not because you believe they are wicked or have committed some other previous improper conduct.

N.T., 12/16/97, at 47–48 (emphasis added). This instruction adequately and accurately communicated to the jury that they were precluded from considering any evidence that *either* defendant had committed prior bad acts as evidence of bad character or of guilt. We presume juries follow instructions. *Commonwealth v. Baker*, 531 Pa. 541, 559, 614 A.2d 663, 672 (1992). Accordingly, Appellant is entitled to no relief on this claim.

Next, Appellant avers that his counsel was ineffective in failing to ensure that Felicia Brokenbrough's statement to the police, given shortly after the murder, was provided to the jury, either by stipulation or by securing Brokenbrough's presence and testimony at trial. As he notes, only a small portion of Brokenbrough's statement was admitted by stipulation. Relying on *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), he avers that, even if Brokenbrough had not been located, her statement would have been admissible to ensure him a fair opportunity to defend against the charges.

Brokenbrough gave a statement to police on December 15, 1993, a week after the victim was kidnapped and subsequently murdered. In that statement, she said that she had been walking with the victim when he was kidnapped; that a light-skinned man wearing a ski mask, standing approximately 6'1" and weighing 160 to 180 pounds, fired a gun at them and subsequently abducted the victim at gunpoint; that the victim was then dragged into a station wagon; that "[a]ll the drug dealers was [sic] jealous of [the victim];" and that a pimp

through whom she had occasionally worked as a prostitute warned her that the culprits "are going to shoot at you because you can describe them." She further identified a picture of the man who kidnapped the victim, and the picture was not of Bowers or of Appellant. Felicia Brokenbrough Statement, 12/15/93 (Appendix at 423–27).

At the conclusion of his defense, Appellant's trial counsel read two stipulations into the record. Those stipulations were:

> The first stipulation is that both prosecution and the defense attempted to locate this woman and we were unsuccessful in doing so. The second stipulation is that Miss Brokenbrough was interviewed by the police one week after the shooting of Mr. Haynes. And the following question and answers were made: the police investigator asked her Felicia, I'm showing you a folder containing eight photographs. The folder is numbered photo number two. Can you identify anyone from the group. And her answer was: number six look like the guy who shot us (me and Kenny). It could be him. . . .
> The person identified by Miss Brokenbrough was neither one of those two defendants.

N.T., 12/15/19, at 39.

The question is whether Appellant's trial counsel was nonetheless ineffective in failing to secure a broader stipulation or, alternatively, seeking a bench warrant to secure Brokenbrough's presence at trial.

 With regard to both of these claims, we find that Appellant cannot establish the prejudice prong, and thus, is not entitled to relief. As noted above, to obtain relief, a petitioner must establish that counsel's performance was deficient and the deficiency prejudiced the petitioner. *Strickland*, 466 U.S. at 668, 104 S.Ct. 2052. Prejudice is demonstrated when there is a reasonable likelihood the outcome of the proceedings would have been different. *Pierce*, 515 Pa. at 158–59, 527 A.2d at 975. Here, the jury was informed of the most crucial part of Brokenbrough's statement: that she identified a man other than Appellant and Bowers as the man

who had initially kidnapped the victim. As the most important aspect of Brokenbrough's statement was provided to the jury, Appellant cannot establish that there is a reasonable likelihood the outcome of the proceedings would have been different. Thus, Appellant's allegation that his trial counsel was ineffective for failing to have the entire statement read into the record and failing to secure a broader stipulation or, alternatively, seeking a bench warrant to secure Brokenbrough's presence at trial, fails.

Finally, Appellant claims his trial counsel did not adequately investigate or confront Raheema Washington. First, he asserts that his counsel was aware that Washington had previously been romantically involved with him and that she was angry at him, accusing him of impregnating her and infecting her with a sexually transmitted disease. Appellant offers that Washington swore that she would get back at Appellant some day. Counsel attempted to discredit Washington's testimony by impeaching her with her prior sworn testimony and prior statement, but did not confront Washington with this powerful evidence of bias and motive against Appellant. Appellant maintains that, because Washington was an important Commonwealth witness, it is reasonable that, if she had been impeached with her hostility and bias against Appellant, that the jury would have discredited her testimony and acquitted Appellant. According to Appellant, counsel could have no reasonable trial strategy for failing to impeach her with this evidence. While trial counsel cross-examined Washington, he failed to impeach her on this basis, and, thus, Appellant asserts counsel was ineffective.

Related thereto, Appellant, in his Supplemental Petition filed on January 29, 2003, contends that a diligent investigation would have revealed that a man named Will Shepard, not Appellant, was in the car at the movie theater with Washington when Malik Bowers was initially arrested for possession of the gun, further undermining Washington's trial testimony. He noted that he had located Cameron Thompson, another passenger in the car, who was prepared to testify to that effect, and that the arresting officer's notes support Thomp-

son's testimony. Supplemental Petition, 1/29/03, at 7–8. Furthermore, on September 12, 2005, Appellant presented to the PCRA court an affidavit by Thompson regarding both the incident at the movie theater as well as Washington's bias against Appellant. *See* Affidavit/Declaration of Cameron Thompson, undated (Trial Exhibit 15; Appendix at 430).[21] Thus, Appellant contends trial counsel was ineffective for failing to locate Thompson and use his testimony to impeach Washington, and to establish someone other than Appellant being in the automobile and in possession of the weapon.

The Commonwealth counters that the claim is waived, and if reviewable, downplays the significance of the purported impeachment evidence by asserting that there is no reason to believe questioning Washington regarding an alleged romantic relationship with Appellant would have altered the trial result. Furthermore, concerning Thompson, the Commonwealth argues that Appellant did not offer to prove these matters until late in the proceedings and that Thompson's affidavit, which was undated and executed 10 years after the murder, does not suggest that he was available and willing to testify at Appellant's trial or that he furnished this information to trial counsel prior to trial. Additionally, the Commonwealth maintains that the affidavit is hearsay and that Appellant did not raise this claim in his Amended PCRA petition; thus, the PCRA court could not have erred in failing to grant relief. Even if reviewable, the Commonwealth avers that this claim is meritless as the trial result would not have been different even if the jury had heard Thompson's testimony that Appellant was not in the car eight days after the murder when the police found a gun that could not be identified as the murder weapon. According to the Commonwealth, Appellant was convicted because Washington testified that he was one of the men who beat and transported the bound victim and identified himself on the telephone.

21. While the Commonwealth argues that only allegations related to Washington's bias, not Appellant's presence or absence in the car with Bowers and Washington at the time in question, appear in Appellant's PCRA petition, the Thompson allegations clearly appear in Appellant's Supplemental Petition. *See* Supplemental Petition, 1/29/03, at 7–8.

As noted above, the PCRA court did not address or even mention this issue in its opinion.

For relief on the failure of counsel to effectively impeach a witness, a petitioner must satisfy the three-pronged test set forth in *Pierce*. Furthermore, regarding the failure to procure a witness's testimony, a petitioner must demonstrate: (1) the witness existed; (2) counsel was either aware of or should have been aware of the witness' existence; (3) the witness was willing and able to cooperate with the defense; and (4) the defendant was prejudiced by the absence of the witness' testimony. *See Commonwealth v. Bryant*, 579 Pa. 119, 153, 855 A.2d 726, 746 (2004).

Washington was a significant witness for the Commonwealth. She was the only eye-witness who testified that Appellant was with the victim on the night of the kidnapping. Importantly, not only did she testify that Appellant was in her apartment with the victim, she offered that she saw him go with Durrante to use the telephone. Thus, Washington's testimony supported Hall's testimony, noted above, that the kidnapper who spoke with him on the phone referred to a robbery against Hall which Appellant had committed and that it was Appellant on the telephone. Furthermore, she testified that a week after the kidnapping and murder, on December 16, 1993, at a Montgomery County movie theater, she saw Appellant with a gun. Thus, Washington's testimony not only established his involvement in the kidnapping, but also placed Appellant with a weapon. Indeed, the Commonwealth's murder case was built entirely on circumstantial evidence.

Furthermore, as the PCRA court failed to address this issue in its opinion, we do not know its basis for denying relief and whether it was on procedural or substantive grounds. Moreover, the PCRA court held no hearing, and, thus, we do not know trial counsel's awareness of this information, and if so, why he did not utilize it to impeach Washington.

On this record, we are unprepared to find as a matter of law that Appellant cannot establish arguable merit, or prejudice, and, as noted above, there is no record concerning

counsel's strategic basis for his actions. Accordingly, we must vacate the PCRA court's order denying relief on this issue. Further, we remand the matter for the PCRA court to dispose of the question in the first instance, hold a hearing, if necessary, and draft an opinion, complete with findings of facts and conclusions of law to enable our review of: (1) the allegations concerning trial counsel's ineffectiveness for failure to impeach Raheema Washington with evidence of motive and bias against Appellant; and (2) the allegations concerning counsel's failure to present Cameron Thompson as a witness and use information from Thompson regarding Washington's testimony concerning Appellant's presence at the movie theater on December 16, 1993.

## C. Investigator's Conflict of Interest

Appellant argues that his trial counsel was ineffective in that he retained an investigator with a conflict of interest: the investigator was also representing Bowers, his co-defendant. He asserts that a plausible alternative defense strategy would have targeted Bowers, and he was precluded from doing so by his investigator's conflict of interest. Moreover, he argues, in a case involving a conflict of interest like the instant one, prejudice should be presumed. The PCRA court rejected Appellant's claim, concluding Appellant failed to prove he was prejudiced by the dual representation, and deemed the claim meritless on that basis.

In a case where an *attorney* has an actual conflict of interest—representing competing interests, such that his performance is impacted—prejudice may be presumed. *Commonwealth v. (Rodney) Collins*, 598 Pa. 397, 420, 957 A.2d 237, 251 (2008). However, as the Commonwealth notes, we have declined to impose conflict requirements on investigators analogous to those on attorneys. *Commonwealth v. Strong*, 522 Pa. 445, 461, 563 A.2d 479, 487 (1989).

Moreover, while Appellant theorizes that the investigator's dual representation might have made it difficult for him to fulfill his responsibilities to both clients, he demonstrates no concrete way in which he was actually, rather than hypotheti-

cally, prejudiced by the dual representation.[22] As Appellant further cites no authority for revisiting *Strong* and bringing our treatment of investigators' conflicts in line with those of attorneys, we will not presume prejudice in the absence of any concrete indication thereof. Accordingly, the PCRA court did not err in dismissing this claim without a hearing.

## D. Other Crimes Evidence

Appellant argues the Commonwealth was erroneously permitted to introduce evidence that, six weeks before the kidnapping in this case, he had attempted to rob and kidnap prosecution witness Hall, even though he was never charged with any offense and no substantial evidence of the offense was proffered. Brief for Appellant at 50 (citing *Commonwealth v. Donahue*, 519 Pa. 532, 543, 549 A.2d 121, 127 (1988)). He contends that trial counsel was ineffective both for failing to object to the admission of this "other crimes" evidence, and, following its introduction, in failing to request an immediate cautionary instruction. He cites, *inter alia, Commonwealth v. Billa*, 521 Pa. 168, 183, 555 A.2d 835, 843 (1989), for the principle that failure to request a required limiting instruction constitutes ineffectiveness.

The PCRA court concluded the evidence that Appellant attempted to rob and kidnap Hall was admissible under the *res gestae* exception to general rule against the admission of other crimes evidence, citing *Commonwealth v. Lark*, 518 Pa. 290, 543 A.2d 491 (Pa.1988), and so this allegation of ineffectiveness lacked arguable merit. That exception "allows admission of other crimes evidence when relevant to furnish the context or complete story of the events surrounding a crime." *Commonwealth v. Dillon*, 592 Pa. 351, 360, 925 A.2d 131, 137 (2006).

**22.** Appellant's only attempt to show actual prejudice on this issue is to refer to his allegations that his counsel inadequately investigated both certain witnesses and certain mitigating evidence. We reject those claims elsewhere. Moreover, Appellant makes no showing that any alleged inadequacy was related to the investigator's dual representation.

Here, Hall testified about the conversation he had on the phone with Appellant the night of the kidnapping of the victim:

And he said that that was he, and I asked who it is. And he told me that if I don't remember him from 11th Street, that he had robbed me before, and I asked if it is Rasheed and he said yes. And he told me that—he had asked me for the Dread but now he got him. And he needs $20,000 in 15 minutes or the Dread is dead.

N.T., 12/11/97, at 21. Hall was then asked to explain Appellant's reference in the call to the prior robbery, and Hall testified that, six weeks before the murder herein, as he was about to go into his house one night, Appellant approached him with a gun and, along with two others, tried to take Hall into his house. *Id.* at 22–23. Hall added that, during this incident, Appellant told Hall that Appellant was looking for "the Dread," the victim herein, and asked Hall if he knew where he was. *Id.* at 48–57.

While Appellant complains that Hall's reference to the prior robbery attempt by Appellant constitutes inadmissible other crimes evidence, as the Commonwealth argues, this evidence was admissible both to prove Hall's knowledge of Appellant's identity, and to explain the story of the victim's abduction, including that Appellant had been previously searching for the victim. *See Commonwealth v. Thomas,* 552 Pa. 621, 639, 717 A.2d 468, 477 (1998) (evidence of defendant's prior bad acts are admissible, *inter alia,* "to establish the identity of the person charged with the commission of the crime, or where it was part of the chain or sequence of events which formed the history of the case and formed part of the natural development of the facts"). Accordingly, its admission was not error, and trial counsel was thus not ineffective for failing to object.

Appellant additionally contends that trial counsel was ineffective for failing to request a limiting instruction. As the PCRA court noted, however, it did provide such an instruction in its jury charge. *See* N.T., 12/16/97, at 47–48.[23] Assuming it

23. The instruction is quoted *supra* at pages 268–69.

was error, as Appellant further contends, not to give an *immediate* instruction following Hall's testimony, Appellant fails to explain how he was prejudiced by this failure, given the brief discussion of this relatively unremarkable prior crime. *Compare Billa,* 521 Pa. at 180, 555 A.2d at 841 (granting relief in light of "vivid description" by a prior rape victim of defendant's violent sexual assault against her, which was "highly inflammatory" and "created the substantial danger" that the jury would be swayed by evidence showing "his propensity to sexually assault young Hispanic females").

Accordingly, we conclude the PCRA court correctly dismissed this claim without a hearing.

### E. Reasonable Doubt Instruction

Appellant argues the trial court provided a constitutionally defective jury instruction on reasonable doubt, and that his trial counsel was ineffective for failing to object to that instruction. He contends the trial court instructed the jury that a reasonable doubt is one which "would restrain a reasonable person from acting in a matter of importance to himself or herself," N.T., 12/16/97, at 9–10, whereas Pennsylvania's Standard Jury Instruction on reasonable doubt informs a jury that a reasonable doubt "would cause a reasonably careful and sensible person to hesitate before acting upon a matter of importance in his own affairs." Brief for Appellant at 55. Since a lesser quantum of evidence would cause a person to "hesitate" than would "restrain" him, Appellant suggests it is possible that the jury applied a constitutionally infirm reasonable doubt standard in evaluating the evidence against him. The PCRA court noted the instruction had been taken verbatim from Pennsylvania's Suggested Standard Criminal Jury Instructions, and thus concluded it represented a "proper statement of the law." PCRA Court Opinion, 11/28/05, at 7.

Our trial courts are invested with broad discretion in crafting jury instructions, and such instructions will be upheld so long as they clearly and accurately present the law to the jury for its consideration. *Commonwealth v. Rainey,* 593 Pa. 67, 112–13, 928 A.2d 215, 242–43 (2007). Where a defendant

appeals a jury instruction, we consider the challenged instruction in its entirety, rather than isolated fragments. *Id.* at 113, 928 A.2d at 243.

Appellant cites the 1979 edition of the Suggested Standard Criminal Jury Instructions, still mirrored in Pa. S.S.J.I. (Criminal) § 7.01, First Alternative (2005) ("A reasonable doubt is a doubt that would cause a reasonably careful and sensible person to hesitate before acting upon a matter of importance in his or her own affairs."). However, the most recent edition includes an alternative reasonable doubt instruction:

> [T]o find the defendant guilty beyond a reasonable doubt, you must be convinced of [his or her] guilt to the same degree you would be convinced about a matter of importance in your own life in which you would act with confidence and without restraint or hesitation.

Pa.S.S.J.I. (Criminal) § 7.01, Second Alternative (2012). This alternative incorporates the idea of "restraint" utilized in the trial judge's instruction, rather than the "hesitate" formulation of the First Alternative.[24]

Moreover, we have repeatedly approved of the "restrain from acting" formulation of reasonable doubt utilized instantly by the trial court. *See, e.g., Clark,* 599 Pa. at 229, 961 A.2d at 95; *Rios,* 591 Pa. at 611, 920 A.2d at 806. Indeed, we have concluded that the distinction Appellant attempts to draw between "hesitate" and "restrain" is legally *de minimis,* and so does not render a trial court's instruction infirm. *Clark,* 599 Pa. at 229, 961 A.2d at 95; *Rios,* 591 Pa. at 611, 920 A.2d at 806.[25] As a result, his argument that counsel should have objected to the jury instruction lacks arguable merit, and his

24. The Suggested Standard Jury Instructions themselves are not binding and do not alter the discretion afforded trial judges in crafting jury instructions; rather, "[a]s their title suggests, the instructions are guides only." *Butler v. Kiwi, S.A.,* 412 Pa.Super. 591, 604 A.2d 270, 273 (1992).

25. In fact, the trial court used the "hesitate" formulation of the reasonable doubt instruction during the penalty hearing. *See* N.T., 12/19/97, at 115.

ineffectiveness claim fails.[26] Accordingly, the PCRA court correctly dismissed this claim without a hearing.

## F. Joint Sentencing Proceedings

Appellant argues that his penalty phase trial, held jointly with co-defendant Bowers, did not afford him his constitutionally mandated "individualized determination" of his sentence. Brief for Appellant at 57–61. He concedes severance is not required in every case, but avers that, here, his interests and Bowers' interests were in opposition such as to necessitate separate penalty trials. He further concedes the PCRA court found waiver because he had agreed to a joint penalty hearing, Brief for Appellant at 59, but argues that, because the only alternative offered by the trial court was separate hearings before the same jury, he had no real choice. Appellant additionally contends no waiver colloquy was conducted, and so it is impossible to confirm his "waiver" of a separate penalty hearing was knowing, intelligent, and voluntary.

While these claims of trial court error are waived, Appellant presently asserts trial counsel was "ineffective for failing to object to the joint penalty proceedings and for failing to properly advise Appellant regarding his waiver of rights." Brief for Appellant at 60. However, because Appellant concedes he agreed to a joint penalty hearing, he cannot now allege that counsel was ineffective for failing to object. Thus, the only ineffectiveness claim remaining is Appellant's claim that counsel improperly advised him regarding his "waiver" of his "right" to a separate penalty hearing.[27]

26. Appellant is correct that the Supreme Court has explicitly approved the "hesitate" instruction. *Victor v. Nebraska*, 511 U.S. 1, 21, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). However, as the federal Constitution mandates no specific formulation of the instruction, but merely requires the court to communicate to the jury the necessity that they "reach a subjective state of near certitude of the guilt of the accused," *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), *Victor* does not call *Clark* or *Rios* into question.

27. Indeed, there is no constitutional right to an individual sentencing hearing, merely an individualized sentence, and where a defendant does not show he is prejudiced by a joint sentencing hearing we will not find a due process violation. *Commonwealth v. Romero*, 595 Pa. 275,

In this regard, Appellant wholly fails to discuss how counsel improperly advised him, or detail the information counsel provided to him which was inaccurate. Absent presentation of such erroneous advice, Appellant cannot prevail on this ineffectiveness claim. Thus, on this basis, we conclude the PCRA court correctly dismissed this claim without a hearing.

### G. Mitigating Evidence

Appellant next argues his trial counsel was ineffective in failing to produce, at the penalty phase proceeding, mitigating evidence, and that the PCRA court erred in failing to hold a hearing regarding this evidence. Specifically, Appellant maintains that there was "substantial and compelling mitigating evidence at the time of Appellant's trial concerning Appellant's traumatic background, and lifelong developmental and cognitive impairments." Appellant's Brief at 62. More precisely, Appellant asserts that he could establish that he came from a broken home in which his father sold and abused drugs, and that he never developed a relationship with his father. Also, Appellant offers that, not only was he abandoned by his father, but that he was physically abused by his stepfather, who also abused his mother; was physically abused by his mother; and was emotionally scarred by the abuse, witnessing his mother being abused, and generally suffering from neglect. This was because his mother was plagued with chronic illnesses that left her unable to care for her children and because, when able, his mother worked "long days." *Id.* at 64. Moreover, Appellant avers. his mother drank during her pregnancy and he suffered a number of head injuries, so that he may have been cognitively impaired. Appellant offers that he suffered more than average childhood ailments and, when he

307–08, 938 A.2d 362, 381 (2007), *rev'd on other grounds, Commonwealth v. (Kenneth) Williams*, 597 Pa. 109, 126, n. 6, 950 A.2d 294, 304, n. 6 (2008). Here, Appellant argues he was prejudiced because the prosecution offered different evidence against him and against Bowers, and, in some cases, the evidence cast Bowers in a more sympathetic light, as the evidence indicated Bowers had a more difficult childhood; the Commonwealth sought more aggravating factors against Appellant; and, Appellant had a longer prior criminal history. *See* Brief for Appellant at 58. However, we rejected virtually the same claim in *Romero, supra.*

was one year old, he became seriously ill and was diagnosed with an advanced case of pneumonia that required admittance to the hospital.

Additionally, Appellant maintains that his state was "exacerbated by [his mother's] overprotectiveness, which bordered on smothering and left [Appellant] even more incapable of adapting." *Id.* at 65. Appellant points to school records which indicate absences attributed to parental neglect and an inability to focus. Appellant suffered from a brutal attack by another student in school, after which family members observed a change in Appellant, including using drugs and "getting into trouble." *Id.* at 66. It was at this time that Appellant became involved with Malik Bowers, who Appellant's mother would testify "was 'street smart' and displayed a 'flashy' style," and who had a power over Appellant.

From all of the above, Appellant concludes that he was psychologically impaired and suffered brain injuries which "impeded and undermined his ability to reason properly, to think things through, to consider consequences of behavior, to control impulses and emotions, and to have proper, rational judgment." *Id.* at 69. Finally, he avers, his trial counsel failed to introduce testimony from a mental health expert, who, according to Appellant, could have explained the consequences of Appellant's troubled upbringing on his psychological state during the crime. Appellant maintains that, this information was available to trial counsel, that counsel failed to investigate and present this mitigation evidence, and that he was prejudiced by trial counsel's failure to present this evidence; thus, he contends he is entitled to an evidentiary hearing.

The Commonwealth responds that the evidence Appellant now claims trial counsel failed to present is cumulative to, or contradicts, the evidence counsel presented, or is inadmissible or speculative. Specifically, the Commonwealth points out that Appellant's counsel chose to present Appellant, through five members of his family, as a family-oriented person of good character at trial. Now, according to the Commonwealth, Appellant believes that trial counsel should have portrayed

him as a troubled man with mental problems. The Commonwealth contends that Appellant never told counsel about his traumatic background and that it was reasonable for counsel to paint Appellant as having a nice childhood. The Commonwealth contextualizes the evidence proffered by Appellant, and avers that Appellant's claim that counsel should have discovered and presented through a mental health expert Appellant's cognitive impairments is contrary to the evidence Appellant's family provided at the penalty phase hearing and is speculative, as he provides no proffer from a medical expert that he has any developmental or cognitive problem.

The PCRA court rejected Appellant's claim that his trial counsel had conducted an inadequate investigation, as Appellant failed to offer any affidavits or medical records to support his claim. Thus, the PCRA court concluded that Appellant's claim had been inadequately developed under *Commonwealth v. (Lawrence) Collins,* 546 Pa. 616, 687 A.2d 1112 (1996).

The inquiry of whether trial counsel failed to investigate and present mitigating evidence turns upon various factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the mitigation evidence that could have been presented. *(Ronald) Collins,* 585 Pa. at 72, 888 A.2d at 580. However, "[n]one of these factors, by itself, is dispositive of the question presented, because even if the investigation conducted by counsel was unreasonable, such fact alone will not result in relief if the [petitioner] cannot demonstrate that he was prejudiced by counsel's conduct." *Commonwealth v. Ligons,* 601 Pa. 103, 143, 971 A.2d 1125, 1149 (2009).

To establish prejudice, a petitioner must demonstrate that there is a reasonable probability that, but for trial counsel's errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. A reasonable probability "is a probability sufficient to undermine confidence in the outcome." *Id.* Further, in determining prejudice, "we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith,* 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Thus, in

considering whether a petitioner was prejudiced, we must consider not only the evidence and argument presented at the penalty phase, but also the evidence and argument that would have been presented at the penalty hearing had trial counsel properly investigated such evidence. *Id.* at 535–36, 123 S.Ct. 2527 (citing *Williams v. Taylor*, 529 U.S. 362, 397–98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see generally, Commonwealth v. Malloy*, 579 Pa. 425, 461, 856 A.2d 767, 789 (2004)). As recently explained by the United States Supreme Court, however, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding ... [c]ounsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Harrington v. Richter*, — U.S. ——, 131 S.Ct. 770, 787–88, 178 L.Ed.2d 624 (2011) (citations omitted); *cf. Cullen v. Pinholster*, — U.S. ——, 131 S.Ct. 1388, 1408, 179 L.Ed.2d 557 (2011) (permitting appellate court to reweigh aggravation evidence against totality of mitigation evidence). Therefore, assuming, *arguendo*, Appellant's contention has arguable merit and that trial counsel had no reasonable strategy for failing to investigate and offer this mitigation evidence, Appellant still must establish prejudice under the above-stated standards to obtain relief.

Taking the mitigation evidence proffered by Appellant, we are simply unable to conclude that Appellant suffered prejudice. The evidence offered by the Commonwealth at the penalty phase resulted in the jury finding three aggravating circumstances—Appellant held the victim for ransom; Appellant had a significant history of felony convictions involving the use of violence; and, previously, Appellant had been convicted of another murder.

The weight of the evidence supporting these aggravating factors is significant. Specifically, the jury heard that Appellant previously committed numerous violent crimes, all shortly before Appellant's murder of Andrew Haynes. First, in May 1990, four years prior to the murder *sub judice*, Appellant was involved in armed robbery. N.T., 12/18/1997, at 25. Two and one-half years after committing armed robbery, and only one

year prior to Appellant's murder at issue in this case, in January 1993, Appellant was convicted of third-degree murder and four counts of aggravated assault, involving an incident in which a 21–year–old victim, Donnell Carroway, who was riding in an automobile with four other individuals, was shot in the back of the head and killed by gunfire from another car. N.T., 12/18/1997, at 27–28. All five crimes in this incident were felonies of the first degree. Four months after the murder of Carroway, Appellant, on May 5, 1993, robbed two victims by gun point. In the course of the robbery, Appellant shot one of the victims, Kareem Astillero, once in the chest and once in the leg. Appellant shot the other victim, Frank Lee, three times in the legs. N.T., 12/18/1997, at 30. Appellant was subsequently convicted of robbery and aggravated assault for these crimes—again, felonies of the first degree. A year and one-half later, on January 12, 1995, while in prison, and the day before the verdict in Appellant's trial for the murder of Carroway, Appellant and another individual stabbed Travis Harris, numerous times. N.T. 12/18/1997 at 31. This resulted in a conviction for aggravated assault and conspiracy. N.T. 12/18/1997 at 32.

Of course, this evidence was in addition to the evidence offered at trial concerning the underlying convictions: that Appellant had kidnapped Haynes; demanded a significant amount of money for his return, which, his family could not afford; the victim's hands were bound behind his back and a hood was placed over his head; the victim was murdered execution style with four bullets in the back of his head; and the victim's body was discarded in a vacant lot. All of this evidence serves as a potent and an overwhelming counterweight to Appellant's current proffer of mitigating evidence.

In light of the above evidence—including evidence that Appellant committed another murder, "the most powerful imaginable aggravating evidence," *Wong v. Belmontes*, 558 U.S. 15, 130 S.Ct. 383, 391, 175 L.Ed.2d 328 (2009) (citations omitted)—which indicated Appellant's recent involvement in violent crimes resulting in death or serious bodily injury, we are satisfied that, even embracing Appellant's proposed miti-

gation evidence, he cannot establish prejudice—that is, assuming such evidence had been presented, we cannot conclude the outcome of the proceedings would have been different, or that Appellant did not receive a fair trial due to its omission. Accordingly, we conclude the PCRA court properly dismissed Appellant's ineffectiveness claims regarding the presentation of mitigation evidence without a hearing.

## H. Aggravating and Mitigating Circumstance Instruction

Appellant next argues that the trial court erred in charging the jury as to the nature of aggravating and mitigating circumstances. He suggests that the instruction minimized the importance of his character and background, and was thus infirm. While this claim of trial court error is waived, Appellant presently asserts trial counsel was *per se* ineffective for failing to challenge this instruction.

Specifically, the court instructed the jury:

[A]ggravating circumstances are things about the killing and the killer which make a first degree murder case more terrible and thus deserving of the death penalty. While mitigating circumstances are those things which make the case less terrible and less deserving of the death penalty.

N.T., 12/18/97, at 10. The PCRA court held that this instruction was unobjectionable because it was "verbatim" from the Suggested Standard Jury Instructions. PCRA Court Opinion, 11/28/05, at 8. However, the definitions of aggravating and mitigating circumstances have been removed from Pa.S.S.J.I. (Criminal) § 15.2502E for two reasons: first, a fear that the use of the word "terrible" would prejudice the jury, and, second, the belief that no definition of the terms "aggravating and mitigating circumstances" is necessary, since qualifying circumstances will be specified later in the charge. Pa.S.S.J.I. (Criminal) § 15.2502E, Note.

While the trial court's version of the jury instruction has been removed from the standard instructions, nevertheless, we have repeatedly upheld this instruction as constitutionally adequate, even after it was excised from the Suggested Stan-

dard Jury Instructions. *See, e.g., Commonwealth v. Gwynn,* 596 Pa. 398, 415–16, 943 A.2d 940, 951 (2008). Accordingly, Appellant's claim lacks arguable merit, and so we conclude the PCRA court correctly dismissed this claim without a hearing.

## I. Preponderance of the Evidence Instruction

Appellant argues the trial court gave an inaccurate penalty phase instruction to the jury as to the meaning of the phrase "preponderance of the evidence" which, he contends, imposed an improperly high burden on him to prove mitigation evidence. Appellant concedes the trial court described "preponderance of the evidence" as "the greater weight of the evidence," but asserts this did not adequately communicate the nature of a preponderance of the evidence to the jury. While this claim of trial court error is waived, Appellant presently asserts trial counsel was ineffective for failing to challenge this instruction. The PCRA court rejected this claim, asserting that instruction represented an accurate statement of the law.

The Suggested Standard Jury Instructions recommend a judge describe the defendant's burden to prove mitigating factors by a preponderance of the evidence as follows:

> [T]he defendant only has to prove [a mitigating factor] by a preponderance of the evidence, that is, by the greater weight of the evidence. This is a less demanding standard than proof beyond a reasonable doubt. Facts are proven by a preponderance when the evidence shows it is more likely than not that the facts are true.

Pa.S.S.J.I. (Criminal) § 15.2502F(3). The court's actual instruction was:

> [B]y contrast [to the beyond-a-reasonable-doubt standard imposed on the Commonwealth's duty to prove aggravating factors], in this proceeding, the defendants must prove mitigating circumstances. However, they must only prove mitigating circumstances by a preponderance of the evidence; that is, by a greater weight of the evidence.

N.T., 12/19/97, at 115–16. The court thus omitted the description, "facts are proven by a preponderance when the evidence

shows it is more likely than not that the facts are true," from the standard instruction.

We considered, and upheld, materially identical jury instructions in *Rainey, supra,* and *Commonwealth v. (Roy) Williams,* 557 Pa. 207, 732 A.2d 1167 (1999). In both cases, we reasoned that the court's instruction that a defendant must *only* prove mitigating circumstances based on a preponderance of the evidence adequately communicated to the jury that the defendant was subject to a lesser burden of proof regarding mitigating factors than the Commonwealth was subject to regarding aggravating factors. *Rainey,* 593 Pa. at 112–13, 928 A.2d at 242–43; *(Roy) Williams,* 557 Pa. at 245, 732 A.2d at 1187. Accordingly, Appellant's claim lacks arguable merit, and so we conclude the PCRA court correctly dismissed this claim without a hearing.

### J. Double Counting

Appellant next argues the jury was unlawfully allowed to find two aggravating circumstances—a significant history of prior convictions, 42 Pa.C.S.A. § 9711(d)(9), and a prior homicide conviction, id. § 9711(d)(11)—on the basis of the same course of conduct, the shooting of Darnell Carraway.[28] Appellant avers many of our sister states have rejected such "double counting," and attempts to distinguish our decision in *Commonwealth v. Lesko,* 553 Pa. 233, 719 A.2d 217 (1998)—which permitted one factual episode to prove two aggravating factors, and on which the PCRA court relied to reject his claim— on the grounds that we did not therein consider a constitutional challenge to double counting, but merely a contention that using one criminal episode to prove two aggravating circumstances violated Pennsylvania's death penalty statute. Brief for Appellant at 83. While this claim of error is waived in this PCRA context, Appellant presently asserts trial counsel was ineffective for failing to object on this basis to the jury's verdict.

Appellant's constitutional challenge consists in its entirety of a citation to Article I, Section 14 of the Pennsylvania Constitu-

28. *See supra* note 3.

tion, which is not relevant and, thus, is inadequate to distinguish *Lesko*.[29] Accordingly, Appellant's claim lacks arguable merit, and so we conclude the PCRA court correctly dismissed this claim without a hearing.[30]

## K. Significant History Aggravator

Appellant raised two additional ineffectiveness claims specifically regarding the significant history aggravator. First, Appellant argues his trial counsel was ineffective for not asserting that the "significant history" aggravator, 42 Pa. C.S.A. § 9711(d)(9), in Pennsylvania's death penalty statute is unconstitutionally vague. He points to several decisions from our sister states in support of this contention. Brief for Appellant at 84–85 (citing *Arnold v. State*, 236 Ga. 534, 224 S.E.2d 386 (1976); *State v. David*, 468 So.2d 1126 (La.1984); *Gall v. Commonwealth*, 607 S.W.2d 97 (Ky.1980)).

Appellant concedes that we have previously rejected identical arguments. *See, e.g., Commonwealth v. Hill*, 542 Pa. 291, 315, 666 A.2d 642, 654 (1995). On this basis, we likewise reject his contention that there is arguable merit to this ineffectiveness claim, and his citation to decisions from our sister states does not persuade us otherwise.

Second, Appellant contends trial counsel was ineffective for not challenging the trial court's jury instruction on the signifi-

**29.** Article I, Section 14 reads:

All prisoners shall be bailable by sufficient sureties, unless for capital offenses or for offenses for which the maximum sentence is life imprisonment or unless no condition or combination of conditions other than imprisonment will reasonably assure the safety of any person and the community when the proof is evident or presumption great; and the privilege of the writ of habeas corpus shall not be suspended, unless when in case of rebellion or invasion the public safety may require it.

**30.** Moreover, the parties stipulated at the penalty phase hearing that Appellant had been convicted of robbery as a juvenile; robbery and aggravated assault as an adult as a result of an incident in 1993; and aggravated assault and conspiracy as a result of an incident where he and a co-conspirator stabbed another prisoner in Holmesburg Prison in 1995. N.T., 12/18/97, at 24–31. Accordingly, it is not clear that the Carroway murder was even necessary to establish the "significant history" aggravator.

cant history aggravator, arguing its emphasis on the number of prior convictions rendered the factor unconstitutionally vague. For this proposition, Appellant relies on our plurality decision in *Commonwealth v. Holcomb*, 508 Pa. 425, 498 A.2d 833 (1985). He asserts that, in *Holcomb*, the lead opinion emphasized that prior convictions considered for the purpose of determining the significant history aggravator should be "relevan[t]," which is to say similar to the instant offense, and the jury should consider both the "character of the prior convictions and their quantity," thus "channel[ing] the jury's discretion in the application of this aggravating circumstance, thus avoiding constitutional infirmity." Brief for Appellant at 87 (quoting *Holcomb*, 508 Pa. at 463, 498 A.2d at 853). Because the jury was not instructed to consider the relevance and character of his prior convictions, Appellant argues the sentencing court's jury charge was inadequate.

Specifically, the sentencing court instructed the jury:

[T]o find [t]his aggravating circumstance, you must be satisfied that the Commonwealth has proved beyond a reasonable doubt first that the defendants have a significant history of criminal convictions; second, that the defendants were convicted of these crimes, and that these crimes were felonies; and third, that these convictions were for crimes involving the use or threat of violence to the person.

For a defendant to have a significant history of felony convictions, he must have an extensive record of convictions. A single previous conviction regardless of the nature and circumstances of the crime does not constitute a significant history. Two convictions may but need not constitute a significant history. You should take in to account the number of convictions, when the crimes were committed, and the circumstances of the crimes in determining whether or not there is a significant history.

N.T., 12/19/97, at 120–21. The standard instruction, by contrast, reads:

In deciding whether the defendant has a "significant history," the factors you should consider include the number of previous convictions, the nature of the previous crimes and

their similarity to, or relationship with, the murder in this case. No particular number of convictions is automatically "significant."

Pa.S.S.J.I. (Criminal) § 15.2502G(3).

*Holcomb,* of course, as a plurality opinion is non-precedential. Moreover, we have at least twice rejected *Holcomb*'s direction that a defendant's past crimes must be factually similar to merit consideration for purposes of the (d)(9) aggravator. *See Commonwealth v. Rice,* 568 Pa. 182, 200, 795 A.2d 340, 350 (2002); *Commonwealth v. Young,* 536 Pa. 57, 73, 637 A.2d 1313, 1320–21 (1992). Thus, this claim fails on its merits. Furthermore, as Appellant makes no effort to explain how he was prejudiced by the jury instruction the sentencing court issued, he cannot satisfy the prejudice prong of *Pierce.*

For these reasons, we conclude the PCRA court correctly dismissed Appellant's claims without a hearing.

## L. Life–Means–Life Instruction

Appellant next argues he was entitled to a "life-means-life" jury instruction during his sentencing hearing under *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (plurality), because the prosecutor raised his future dangerousness by asking a witness if the witness was aware that there was a possibility Appellant would eventually be pardoned. *See* N.T., 12/18/97, at 64. He concedes the sentencing court informed the jury that they "ha[d] two options in this case: to find the defendant [guilty] and sentence him to death or to sentence him to life imprisonment without parole. That's it and nothing else should be in your mind." *Id.* at 65. Appellant asserts, however, that this cautionary instruction was inadequate and that trial counsel was ineffective for failing to object to it.

As the PCRA court concluded, we considered, and rejected, Appellant's claim that he was entitled to a new penalty phase hearing on this basis on direct appeal. *See Simpson,* 562 Pa. at 281, 754 A.2d at 1277–78. In doing so, we concluded that the trial court had *satisfied* the requirements of *Simmons* by its above instruction, which read as follows in its entirety:

Members of the jury, I am telling you without any chance of being in error so you will understand it completely, thoroughly and throughout, you have two options in this case: **to find the defendant [guilty] and sentence him to death or to sentence him to life imprisonment without parole.** That's it and nothing else should be in your mind and that's an inappropriate question.

N.T., 12/18/97, at 64–65 (emphasis added); *see Simpson,* 562 Pa. at 281 n. 21, 754 A.2d at 1278 n. 21 ("[A]ssuming that future dangerousness was put into issue, the trial court's instruction would suffice to satisfy the requirements of *Simmons*."). Appellant does not acknowledge or attempt to rebut this determination. Accordingly, we conclude the PCRA court correctly dismissed this claim without a hearing.

## M. Specific Intent Instruction

Appellant argues that during the guilt phase of his trial, the court incorrectly instructed the jury that it could find him guilty of first-degree murder on an accomplice theory of liability, without finding that he himself possessed the specific intent to kill Haynes. The PCRA court found this claim had been previously litigated on direct appeal. PCRA Court Opinion, 11/28/05, at 9. Appellant does not contest this conclusion, nor could he reasonably do so given our lengthy discussion of the instruction on direct appeal. *See Simpson,* 562 Pa. at 273–79, 754 A.2d at 1273–77. Critically, Appellant makes no attempt to cast this issue in terms of ineffectiveness. *See* Brief for Appellant at 92–96. Accordingly, the PCRA court correctly dismissed this claim without a hearing.

## N. Pre–Arrest Delay

Appellant contends his trial counsel was ineffective for failing to assert his due process rights were violated by delay prior to his arrest. He argues that witnesses implicated him in the instant homicide in December 1993, on March 29, 1994, and on May 20, 1994, and that the Commonwealth argued he had been involved in the crime during the prosecution of co-conspirator Allister Durrante on October 2, 1995; yet he was

not arrested until July 1996. He asserts that, under *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), if pre-arrest delay caused him "substantial prejudice" and was an "intentional device to gain [a] tactical advantage," dismissal of the indictment is appropriate. *Id.* at 324, 92 S.Ct. 455. Moreover, he avers that, under the decisional law of this Court, pre-arrest delay creates a due process violation if a defendant shows "actual prejudice and that the prosecution lacked sufficient and proper reasons for postponing the prosecution." *Commonwealth v. Snyder*, 552 Pa. 44, 54, 713 A.2d 596, 601 (1998). Here, Appellant argues he was prejudiced because, after the three-year delay, he could no longer recall his whereabouts at the time of the crime or find any witness who could testify as to his whereabouts, and, moreover, several of his felony convictions, including for third-degree murder, occurred between December 1993 and the time he was finally indicted, allowing the Commonwealth to "stack the deck" regarding the significant violent history aggravator. Brief for Appellant at 98. He contends the prosecution had no sufficient basis for its delay.

The PCRA court rejected Appellant's assertions, noting there was no showing that the Commonwealth had been purposefully dilatory, and that the gravamen of Appellant's assertion of prejudice—that he could not remember where he was on the night in question, depriving him of alibi witnesses—was rejected in *Marion, supra.*

While there is no statute of limitations for murder, 42 Pa.C.S.A. § 5551, we have applied the high Court's directive that certain pre-arrest delay may violate a defendant's due process rights since our decision in *Commonwealth v. Daniels*, 480 Pa. 340, 390 A.2d 172 (1978). However, a defendant's due process right against pre-arrest delay is limited; law enforcement is not required to make an arrest as soon as enough evidence has been accumulated to constitute probable cause, or even proof beyond a reasonable doubt. *Id.* at 355–56, 390 A.2d at 180–81. Indeed, there is no right to be arrested or right to prosecution. *Id.* (citing *Hoffa v. U.S.*, 385 U.S. 293, 310, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), and *U.S. v. Lovasco*,

431 U.S. 783, 794, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977)). Only if a defendant can show "that the passing of time caused actual prejudice and that the prosecution lacked sufficient and proper reasons for postponing the prosecution," *Snyder*, 552 Pa. at 54, 713 A.2d at 601, is he entitled to relief. As such, a due process violation will be found only in "extreme cases" when there are "no valid reasons" for the delay. *Snyder*, 552 Pa. at 44, 713 A.2d at 605.

Here, Appellant cannot show the prosecution lacked proper reasons for the delay. As the Commonwealth points out, the best *direct* evidence of Appellant's participation in the kidnapping, beating, and eventual murder at issue arose when the police took Raheema Washington's statement in July 1996. Brief for the Commonwealth at 89. Appellant was arrested shortly thereafter. Whether or not the Commonwealth could have made a case earlier, this additional piece of direct eyewitness evidence serves as a "valid reason" for arresting Appellant after a three-year delay, as required by *Snyder*. Accordingly, Appellant's argument as to this issue lacks arguable merit, and the PCRA court correctly dismissed this claim without a hearing.[31]

## O. Cumulative Effect of Errors

Finally, Appellant argues that if our Court finds that he is not entitled to relief due to inadequate prejudice from any particular issue, he remains entitled to relief based on the cumulative prejudicial effect of all of the alleged errors he sets forth. According to Appellant, these errors undermine confidence in the outcome of the trial.

31. We further agree with the Commonwealth that Appellant is not entitled to relief on the basis that he was prosecuted for other, previously committed crimes in the interim between Haynes' kidnapping and murder and Appellant's arrest for those crimes. While those additional convictions did expose Appellant to additional aggravating factors, any prejudice accruing to Appellant was the result of the foreseeable legal consequences of his own acts. Moreover, Appellant offers no evidence or argument that the order in which the Commonwealth chose to prosecute his various offenses was inappropriate, unlawful, or animated by a desire to obtain a tactical advantage at sentencing.

In our opinion today, we have disposed of four issues solely on grounds of lack of prejudice. These claims, as noted above, are that counsel was ineffective for (1) failing to secure a broader stipulation concerning Felicia Brokenbrough's statement to police and her absence at trial, and/or for failing to seek a bench warrant to secure her presence at trial; (2) retaining an investigator with an alleged conflict of interest; (3) failing to request a limiting instruction regarding other crimes evidence; and (4) failing to produce mitigating evidence during penalty phase.

As we are remanding this matter with respect to issues concerning trial counsel's ineffectiveness regarding certain witnesses, we believe it premature at this juncture to address this claim of cumulative prejudice, and, thus, hold this issue in abeyance until our subsequent review after remand.

## III. CONCLUSION

For the foregoing reasons, we affirm the order of the PCRA court with respect to all issues, except Appellant's claim noted above regarding trial counsel's ineffectiveness for failure to elicit testimony concerning the alleged motive and bias of Raheema Washington against Appellant, as well as allegations concerning the failure to present Cameron Thompson as a witness and failure to use information from Thompson regarding Washington's testimony concerning Appellant's presence at a Montgomery County movie theater on December 16, 1993. The PCRA court's order in this regard is vacated, and the matter remanded to the PCRA court for proceedings consistent with our opinion.

Case REMANDED. Jurisdiction RETAINED.

Justice ORIE MELVIN did not participate in the consideration or decision of this case.

Chief Justice CASTILLE and Justices EAKIN, BAER and McCAFFERY join the opinion.

Justice SAYLOR files a dissenting opinion.

Justice SAYLOR, dissenting.

The majority aptly explains that the PCRA court simply did not do its job in this capital post-conviction case. *See, e.g.,* Majority Opinion at 72 n. 8, 65 A.3d at 259–60 n. 8. Quite unfortunately, we have seen the same in many other languishing death-penalty cases.[1] Furthermore, as Appellant observes, a fundamental prerequisite to the summary dismissal of Appellant's petition—namely, adequate pre-dismissal notice under the Criminal Rules of Procedure—is absent, since the PCRA court's *pro forma* notice failed to develop the reasons for the dismissal and thereby provide a basis for corrective amendment.[2] See Pa.R.Crim.P. 909(B)(2)(a) (requiring that

1. *See, e.g., Commonwealth v. Smith,* 609 Pa. 605, 624, 17 A.3d 873, 883–84 (2011) (commenting that "this case presents the all too common problem of an inadequate PCRA court opinion" in which such court "ignored entirely certain claims"); *Commonwealth v. Beasley,* 600 Pa. 458, 477, 967 A.2d 376, 387 (2009) (observing that the post-conviction court provided "no reasoning ... with regard to most claims asserted in the PCRA petition, despite our emphasis on the need for developed, independent reasoning from our post-conviction courts"); *Commonwealth v. Williams,* 594 Pa. 366, 406, 936 A.2d 12, 36 (2007) ("[T]he PCRA court's discussion ... cites a paucity of applicable statutory and case law, and engages in little substantive discussion of the claims."); *Commonwealth v. Brown,* 574 Pa. 231, 233, 830 A.2d 536, 537 (2003) (*per curiam*) (vacating and remanding to a post-conviction court, in part, due to its failure to afford adequate pre-dismissal notice, an "essential predicate for appellate review of the post-conviction proceedings by this Court"); *Commonwealth v. Basemore,* 560 Pa. 258, 290, 744 A.2d 717, 735 (2000) ("In the present case, the disposition of Basemore's claims concerning his trial counsel's effectiveness is hampered by a series of defaults on the part of the PCRA court."); *Commonwealth v. Williams,* 557 Pa. 207, 254, 732 A.2d 1167, 1192 (1999) (Castille, J., concurring) ("The PCRA court's failure to draft an opinion addressing the claims constitutes an abdication of the trial court's duty which cannot be condoned.").
 In no way do I intend to criticize the common pleas judges who do meet or exceed their obligations. I merely make the point that, clearly, we are seeing far too much workproduct that does not comport with acceptable judicial and professional norms.

2. In his brief, Appellant explains as follows:
 The [PCRA] court did not note any defects in the pleadings as required by Rule 905(B) ("When a petition for postconviction collateral relief is defective as originally filed, the judge shall order amendment of the petition, indicate the nature of the defects ..."). After the notice of appeal was filed, and Appellant no longer was able to cure any defects, the PCRA court filed its opinion, asserting that there were such defects. For example, with respect to Appellant's claim

"the judge shall give notice to the parties of the intention to dismiss the petition and shall state in the notice the reasons for the dismissal); *see also* Pa.R.Crim.P. 905(B) (requiring that, "[w]hen a petition ... is defective as originally filed, the judge shall order amendment of the petition, indicat[ing] the nature of the defects"). *See generally Commonwealth v. Williams,* 566 Pa. 553, 568–69, 782 A.2d 517, 526–27 (2001) (discussing the purposes and mechanics of the pre-dismissal notice procedure).[3]

I continue to believe this Court would progress far toward the advancement of the interests of justice and the ultimate resolution of the death-penalty cases if we would consistently require the PCRA courts to perform their duties in a timely, responsible, diligent, and professional fashion. *See Beasley,* 600 Pa. at 477, 967 A.2d at 388 (explaining that "the interests of justice require that complete and correct judicial administration be accomplished by our courts, and in this case a remand is necessary for such purpose"). Instead, on appellate review, as often as not, this Court continues to work around overt and obvious deficiencies while, understandably, attempting to finalize the entrenched litigation. *See, e.g., Smith,* 609 Pa. at 624–77, 17 A.3d at 884–915 (recognizing deficient review on the part of the post-conviction court but nevertheless affirming the denial of guilt-phase relief). Experience is showing, however, that such review practices facilitate, rather than eliminate, the sort of shoddy and dilatory review we have seen and prolong, rather than curtail, the overarching post-conviction process.

> that trial counsel was ineffective for failing to investigate and present mitigation ..., the court wrote that the claim was undeveloped because Appellant did not offer affidavits in support of the claim. Had this defect been identified by the lower court in compliance with Rule 905, counsel would have offered certifications of witnesses pursuant to Rule 902(A)(15).
>
> Brief for Appellant at 3 n. 2 (citation omitted).

**3.** The 2001 *Williams* decision expressly disapproved the check-box form of predismissal notice that was employed in this case and appears to remain in widespread use among PCRA courts, at least in the First Judicial District.

This case also points up another inconsistency in the treatment being accorded to capital post-conviction petitioners. Some receive remands for corrective actions stemming from inadequate pre-dismissal notice, *see, e.g., Brown,* 574 Pa. at 233, 830 A.2d at 537, and some do not. *See* Majority Opinion at 111–12, 65 A.3d at 284 (affirming the dismissal of all but two of Appellant's claims in the absence of adequate pre-dismissal notice and the concomitant opportunity for amendment). Like the treatment of the requirement for an evidentiary hearing, the line of demarcation appears to be *ad hoc. See generally Smith,* 609 Pa. at 677–79, 17 A.3d at 915–17 (Saylor, J., dissenting) (commenting on the ongoing disparate enforcement of the hearing requirement in the face of material disputed factual matters).

I dissent in favor of requiring reasonable compliance, in our post-conviction courts, with the rules and principles which are supposed to govern their review.