J-S27044-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHARLES FREEMAN | : | |
| | : | |
| Appellant | : | No. 3571 EDA 2017 |

Appeal from the PCRA Order October 5, 2017
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s):  CP-46-CR-0004824-2013

BEFORE:  SHOGAN, J., LAZARUS, J., and DUBOW, J.

MEMORANDUM BY DUBOW, J.:                    **FILED OCTOBER 19, 2018**

Appellant, Charles Freeman, appeals from the October 5, 2017 Order, entered in the Montgomery County Court of Common Pleas, dismissing his first Petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9545.  After careful review, we affirm.

We summarize the facts and procedural history as follows.  On May 5, 2013, Appellant, Rasheed Teel, Ander Collier, and Omar Miller, devised a plan to rob Kareem Borowy (the "Victim").  Appellant drove the group to the Victim's house in Pottstown and waited in the car.  Teel and the other men, armed with a .45 caliber Glock pistol, entered the residence and demanded the Victim turn over a large quantity of marijuana and $3,000 in cash.  The Victim told the robbers that he kept his money in a "stash house" at a different location.  The men took the Victim outside and forced him into the getaway car driven by Appellant.  Appellant drove away from the Victim's house,

presumably intending to travel to the Victim's stash house. When Appellant slowed the car down on a rural roadway, the Victim escaped. Collier chased after the Victim and shot him twice. When he returned to the vehicle, Collier told the others that he saw the Victim fall to the ground, and instructed Appellant to drive away. The Victim died from his gunshot wound.

In response to an anonymous tip, Montgomery County detectives interviewed Teel on May 9, 2013. Teel ultimately admitted that he was present during the crimes, and he identified Collier as the gunman and Appellant as the driver of the getaway car. Teel pleaded guilty to third-degree murder, and agreed to testify for the Commonwealth against his co-conspirators.

Police arrested Appellant on May 20, 2013, and charged him with Homicide, Kidnapping, Robbery, Persons Not to Possess a Firearm, Receiving Stolen Property, False Imprisonment, and Conspiracy to commit each of those offenses.[1]

Appellant, Collier, and Miller proceeded to a joint trial on April 15, 2014. The Commonwealth presented the testimony of numerous witnesses, including Teel.

On April 21, 2014, following a five-day trial, the jury convicted Appellant of Second-Degree Murder, Robbery, Kidnapping, Conspiracy to commit

---

[1] 18 Pa.C.S. §§ 2502, 2901(a)(3), 3701(a)(1)(i), 6105, 3925, 2903, and 903(b), respectively.

Kidnapping, and Conspiracy to commit Robbery. On June 24, 2014, the trial court sentenced Appellant to life imprisonment.

Appellant timely appealed and this Court affirmed his Judgment of Sentence on December 2, 2015. *Commonwealth v. Freeman*, 128 A.3d 1231 (Pa. Super. 2015). He did not seek review with the Pennsylvania Supreme Court

On July 7, 2016, Appellant filed a timely *pro se* PCRA Petition raising seven issues challenging trial and appellate counsels' stewardship. He also raised an issue alleging that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963), by not notifying him that Teel had sustained a serious brain injury before Appellant's trial which rendered Teel incompetent to testify. On July 28, 2016, the PCRA court appointed Gregory P. DiPippo, Esquire, to represent Appellant.

On October 12, 2016, Attorney DiPippo sent Appellant a "no merit" letter pursuant to *Commonwealth v. Turner*, 544 A.2d 213 (Pa. 1988), *Commonwealth v. Finley*, 550 A.2d 213 (Pa Super. 1988) (*en banc*), and their progeny. Appellant filed a Response to counsel's "no merit" letter on November 3, 2016.

On January 11, 2017, Attorney DiPippo filed a Petition to Withdraw as Counsel.

On January 20, 2017, after reviewing the eight issues Appellant raised in his *pro se* PCRA Petition, the court granted Attorney DiPippo's Petition to Withdraw as Counsel. The court concluded that, although Appellant's first six

issues had no merit, Appellant was entitled to a court-appointed attorney to investigate the factual questions raised in his seventh and eighth issues.[2] Accordingly, the PCRA court appointed Patrick J. McMenamin, Esquire, to represent Appellant.

On July 18, 2017, counsel filed an Amended PCRA Petition re-raising Appellant's seventh and eighth issues only. The Commonwealth filed an Answer to the Amended Petition on August 17, 2017.

On August 29, 2017, the PCRA court issued a Notice of Intent to Dismiss Appellant's PCRA Petition without a hearing pursuant to Pa.R.Crim.P. 907. Appellant did not file a Response to the PCRA court's Rule 907 Notice.

On October 5, 2017, the PCRA court dismissed Appellant's Petition. Appellant filed a timely appeal. Both Appellant and the PCRA court complied with Pa.R.A.P. 1925.

Appellant raises the following three issues on appeal:

1. Did the lower court err in its determination, without a hearing, that trial counsel provided to Appellant at the time of trial effective assistance of counsel despite trial counsel's alleged failure to investigate and establish that prosecution witness Rasheed Teel had, prior to his testimony, suffered a gunshot wound to the head and that the prior injury rendered the witness unable to accurately recall and testify with respect to the offense at trial?

2. Did the lower court err in its determination, without a hearing, that the Commonwealth did not commit a *Brady* violation with respect to the issue of Rasheed Teel's gunshot wound to the head, on the basis that the knowledge of Teel's prior injury was

_____

[2] Appellant's seventh issue challenged trial counsel's failure to investigate Teel's competence to testify, and his eight issue asserted his *Brady* claim.

equally available to the defense, thus rendering the claim meritless?

3. Did the lower court err in denying Appellant an evidentiary hearing pursuant to the [PCRA] inasmuch as Appellant had issues meritorious of review that could only be properly considered following an evidentiary hearing?

Appellant's Brief at v (reordered for ease of disposition).

## **Standard/Scope of Review**

We review the denial of a PCRA Petition to determine whether the record supports the PCRA court's findings and whether its order is otherwise free of legal error. **Commonwealth v. Fears**, 86 A.3d 795, 803 (Pa. 2014). This Court grants great deference to the findings of the PCRA court if the record supports them. **Commonwealth v. Boyd**, 923 A.2d 513, 515 (Pa. Super. 2007). We give no such deference, however, to the court's legal conclusions. **Commonwealth v. Ford**, 44 A.3d 1190, 1194 (Pa. Super. 2012).

To be eligible for relief pursuant to the PCRA, Appellant must establish, *inter alia*, that his conviction or sentence resulted from one or more of the enumerated errors or defects found in 42 Pa.C.S. § 9543(a)(2): a constitutional violation; ineffective assistance of counsel; an unlawfully induced plea; improper obstruction by governmental officials; or in a case where exculpatory evidence has been discovered; an illegal sentence has been imposed; or the tribunal conducting the proceeding lacked jurisdiction. **See** 42 Pa.C.S. § 9543(a)(2)(i)-(vii). Appellant must also establish that the issues raised in the PCRA petition have not been previously litigated or waived. 42 Pa.C.S. § 9543(a)(3).

An allegation of error "is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding." 42 Pa.C.S. § 9544(b). *See*, *e.g.*, *Commonwealth v. Roney*, 79 A.3d 595, 609 (Pa. 2013) (concluding that, where a petitioner failed to raise *Brady* claims at trial and/or on direct appeal, they are waived).

**Ineffective Assistance of Counsel**

In his first issue, Appellant claims his trial counsel was ineffective for failing to investigate whether Rasheed Teel's head injury rendered him incompetent to testify at trial. Appellant's Brief at 16. In particular, Appellant argues that there is a reasonable probability that the outcome of his trial would have been different had counsel discovered that Teel had suffered a gunshot wound resulting in a brain injury. *Id.* at 18. We disagree.

The law presumes counsel has rendered effective assistance. *Commonwealth v. Rivera*, 10 A.3d 1276, 1279 (Pa. Super. 2010). "[T]he burden of demonstrating ineffectiveness rests on [A]ppellant." *Id.* To satisfy this burden, Appellant must plead and prove by a preponderance of the evidence that: "(1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and, (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the challenged proceeding would have been different." *Commonwealth v. Fulton*, 830 A.2d 567, 572 (Pa. 2003). Failure to satisfy any prong of the test will result in

rejection of the appellant's ineffective assistance of counsel claim. *Commonwealth v. Jones*, 811 A.2d 994, 1002 (Pa. 2002).

The Honorable Wendy Demchick-Alloy, who presided over all of the proceedings in this case, has authored a comprehensive, thorough, and well-reasoned opinion, citing to the record and relevant case law in addressing Appellant's challenge to his counsel's representation. After a careful review of the parties' arguments and the record, we adopt the PCRA court's opinion as our own and conclude that this issue warrants no relief. *See* PCRA Court Opinion, dated 12/17/17, at 16-22 (concluding that Appellant's ineffectiveness claim failed because, due to the overwhelming evidence against him, he could not prove the prejudice prong of the ineffectiveness test).

**_Brady_ Violation**

In his second issue, Appellant claims that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963), when it did not disclose to the defense the allegedly material fact that Teel had previously sustained a gunshot wound to the head. Appellant's Brief at 21. Appellant acknowledges that he had heard "a rumor" that Teel had been shot, but argues that this did not obviate the Commonwealth's responsibility to disclose it to his counsel. *Id.* at 21-23.

*Brady* provides that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. *See also* Pa.R.Crim.P.

573(B)(1)(a) (pertaining to the mandatory disclosure of evidence favorable to the accused which is material to guilt or to punishment of the accused, and which is within the possession or control of the prosecutor).

Notably, where a defendant could have raised a **Brady** claim at trial or on direct appeal, but fails to do so, he waives this claim. **See**, **e.g.**, **Roney**, 79 A.3d at 609.

Appellant has acknowledged in his Brief to this Court that he was, at a minimum, aware of a rumor that Teel had sustained a gunshot wound to the head. He also averred in his Amended PCRA Petition that, prior to trial, he and his counsel discussed Teel's gunshot wound. **See** Amended PCRA Petition, 7/19/17, at ¶¶ 17, 21. However, Appellant raised this **Brady** claim for the first time in his PCRA Petition. *Pro Se* PCRA Petition, 7/7/16, at 5. We, thus, conclude that Appellant has waived this issue by failing to raise it "before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding." 42 Pa.C.S. § 9544(b).[3]

**Dismissal Without an Evidentiary Hearing**

In his final issue, Appellant claims that the PCRA court erred in dismissing his Amended Petition without a hearing. Appellant's Brief at 12-15. We disagree.

---

[3] Even if Appellant had not waived his issue, it would fail. **See Commonwealth v. Simpson**, 66 A.3d 253, 265 (Pa. 2013) (concluding that the petitioner's **Brady** claim pertaining to the victim's criminal history lacked merit because, *inter alia*, the petitioner was aware of it).

There is no absolute right to an evidentiary hearing, and a PCRA court has discretion to deny a PCRA Petition without a hearing "if the PCRA court determines that the petitioner's claim is patently frivolous and is without a trace of support in either the record or from other evidence." ***Commonwealth v. Hart***, 911 A.2d 939, 941 (Pa Super. 2006) (citation omitted). When the PCRA court denies a petition without an evidentiary hearing, we "examine each issue raised in the PCRA petition in light of the record certified before it in order to determine if the PCRA court erred in its determination that there were no genuine issues of material fact in controversy and in denying relief without conducting an evidentiary hearing." ***Commonwealth v. Khalifah***, 852 A.2d 1238, 1240 (Pa. Super. 2004) (citing ***Commonwealth v. Hardcastle***, 701 A.2d 541, 542-43 (Pa. 1997)).

As discussed ***supra***, the PCRA court properly concluded that Appellant's ineffective assistance of counsel claim lacked merit and we conclude that Appellant has waived his ***Brady*** claim. Therefore, since Appellant's claims were "patently frivolous and [ ] without a trace of support in either the record or from other evidence[,]" we further conclude that the PCRA court did not err in denying relief without conducting an evidentiary hearing.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/19/18

CLERK OF COURTS
OFFICE
MONTGOMERY COURT
PENNA.

2017 DEC 13 PM 2: 43

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA

CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA      :      Nos.   CP-46-CR-0004824-2013

                                  :

v.                                :

CHARLES FREEMAN                   :

## OPINION

DEMCHICK-ALLOY, J.                                DECEMBER 12, 2017

Appellant, Charles Freeman (hereinafter, "petitioner") appeals from the final order denying his first, timely, counseled petition for post-conviction collateral relief.

## I.   Claims Raised on Appeal

Appellant, through court-appointed counsel, filed a statement raising three claims on appeal:[1]

1.   The undersigned erred in denying Appellant an evidentiary hearing;

2.   The undersigned erred by denying petitioner's claim for relief based on his allegation that the prosecutors violated his right to pretrial discovery of Rasheed Teel's history of brain injury from a gunshot wound to his head, which wound allegedly rendered him incompetent to testify at trial

3.   The undersigned erred by denying petitioner's claim for relief based on his allegation that trial counsel rendered ineffective assistance because he failed to establish that eyewitness Rasheed Teel was incompetent to

---

[1] The order of the second and third claims has been reversed for ease of discussion.

testify at trial

## II.  Facts

Appellant and two co-defendants, Andre Collier and Omar Miller, were tried before a jury and found guilty of robbery and conspiracy to commit robbery, kidnapping, and the murder of Kareem Borowy.  A third co-defendant, Rasheed Teel, pled guilty and testified against appellant, Collier and Miller. Teel began his testimony by identifying appellant in court.  N.T. 4-16-2014, p. 110.  He stated that during the week preceding the weekend of Saturday, May 4, 2013 and Sunday, May 5, 2015, appellant drove him and co-defendant Collier to the Pottstown area in a gray Buick LeSabre.  *Id.* at 112-13. On the weekend of May 4th and 5th, 2013, he and co-defendant Collier went to an apartment on King Street in the borough of Pottstown.  *Id.* at 112-2014.  Teel saw Collier in possession of a black handgun, a trash bag and "thick tape."  *Id.* at 115-17.  On the afternoon of Sunday, May 5, 2013, appellant drove co-defendant Omar Miller to the apartment in the gray LeSabre.  *Id.* at 117-18.  At that time, Collier and appellant raised the idea of committing a robbery of marijuana and money from Kareem Borowy, and Collier, appellant, Teel and Miller made a plan to carry out the robbery at Borowy's home.  *Id.* at 118-20. Collier was "to go in there and get the weed and money[;]" appellant was to drive the group to and from the crime; Miller was to bind Borowy with the tape; and Teel was to serve as the "lookout."  *Id.* at 120.

2

According to Teel, appellant drove the four men in his gray LeSabre to Borowy's home to commit the robbery. *Id.* at 121, 123. Appellant stopped the car near the house and Teel, Miller and Collier went inside. *Id.* at 123-24. The jury heard evidence from which they could infer that the co-defendants arrived at the Borowy home between 1:00 p.m. and 1:17 p.m. Borowy had arranged to meet for lunch that day with his friend, Richard Iacovino, at whose home Borowy kept marijuana and money derived from its sale. N.T. 4-17-2014, pp. 82-83. Borowy never showed up, despite sending Iacovino a text message to say he would arrive soon. *Id.* at 85-86. Iacovino testified that he sent a text message asking where Borowy was, but he did not reply. *Id.* at 87. Montgomery County Detective Mark Minzola reviewed records of transmissions from Iacovino's cell phone and determined that Iacovino sent that text message at 1:17 p.m. N.T. 4-18-2014, pp. 117-18. Detective Minzola reviewed records of transmissions between the cell phones of appellant and Collier and found a call from Collier to appellant at 1:07 p.m., lasting nineteen seconds; a call from appellant to Collier at 1:07:26 p.m., lasting ten seconds; and a call from appellant to Collier at 1:07:44 p.m., lasting fifty-two seconds. *Id.* That testimony supported an inference that the co-defendants entered the home at or before 1:07 p.m.

When Collier entered the Borowy home, he was armed with his handgun. N.T. 4-16-2014, pp. 121-24. The three men found Borowy in the kitchen,

3

washing dishes. *Id.* at 124-25. Collier demanded marijuana and money, and when Borowy replied that he had only a small amount of each in the house, Collier took him upstairs to get it while Teel and Miller rounded up two houseguests and took them to the kitchen, where Miller bound them with Collier's tape. *Id.* at 125-30. Teel testified that Collier brought Borowy back downstairs to the kitchen, at which time Borowy told Collier that he had more marijuana and money at another house. *Id.* at 130-31.

Jeffrey Boyer was one the houseguests. *Id.* at 305, 309-10. Boyer overheard the robbers demanding to know where Borowy kept his money and marijuana, and overheard Borowy reply that he kept them at a friend's house nearby. *Id.* at 313-2014, 315-16. Boyer heard Borowy claiming he was sending text messages to his friend who kept the money and drugs. *Id.* at 314, 317. Boyer heard Borowy and the robbers talking about leaving to go to the friend's home. *Id.* at 317-18. Lewis Scott, the other houseguest, *id.* at 71, heard the robbers ask Borowy the best way to leave his home, and heard Borowy advise them to exit through the back door, but to take the tape from around his mouth so the neighbors would not see that he was gagged, *id.* at 80.

The jury heard evidence from which they could infer that the co-defendants took Borowy from his home before 2:01 p.m. Bruce Levengood, a neighbor, testified that two young men came to his house, shaking with fear,

4

and told them that they had been tied up, and that Borowy had been abducted. *Id.* at 333-336. Detective Minzola testified that Levengood called 911 at 2:01 p.m. N.T. 4-18-2014, p. 118. That testimony supported an inference that the co-defendants left the Borowy home at or before 2:01 p.m.

Teel testified that Collier, Miller and he took Borowy from his home, N.T. 4-16-2014 at 131, and put him in appellant's car, *id.* at 133, with the intention of having Borowy take the men to the other house, *id.* at 134. Teel and Miller knew that they were to leave the house when Collier said, "the ride outside." *Id.* at 132-33. When they marched Borowy outside, appellant was waiting in his gray LeSabre. *Id.* at 133-34.

Teel testified as to the events immediately before Collier killed Borowy. The four conspirators and Borowy drove about for a short time, but when Borowy pointed out a house, appellant drove past it. *Id.* at 134. Appellant eventually slowed the car as he nodded to Collier. *Id.* at 135-36. At that point, Borowy somehow freed his hands and bolted from the car, but Collier stepped out of the car, fired two shots from his gun and got back into the car, telling the other three co-conspirators that he had seen Borowy fall to the ground. *Id.* at 136.

Borowy was found shot to death on Sanatoga Station Road. *Id.* at 101-06. Linda Morgan, the last person who saw him alive, lying in the weeds by the roadside crying for help, *id.* at 339-40, described Sanatoga Station Road as a

5

"back road," the location of a gun club and several businesses that were closed on that Sunday. *Id.* at 339-41. She called 911 at approximately 2:26 p.m., and Lower Pottsgrove Township Detective Daniel Kienle arrived at the scene at 2:29 p.m. *Id.* at 101. Detective Kienle found no pulse. *Id.* at 104.

Walter Hofman, M.D., an expert witness in forensic pathology, testified at trial that Borowy died that afternoon by the roadside, having bled to death from a gunshot wound that entered his back and struck his liver and a kidney. *Id.* at 45-52. Dr. Hofman described it as "a life-threatening gunshot wound" to a vital part of Borowy's body. *Id.* at 51. Dr. Hofman estimated that Borowy lived for five to ten minutes after having sustained the gunshot wound, although that time frame could have been slightly more than ten minutes or fewer than five. *Id.* at 51-52, 64-65.

## A. Teel's cross examination suggests his prior inconsistent statements indicate consciousness of guilt, not an inability to remember or testify accurately

By means of skillful cross-examination, Collier's lawyer led Teel to admit that he had repeatedly lied to investigating police detectives about his involvement in the robbery, kidnapping and murder of Borowy, and about the number of other men involved and their identities. When the detectives arrested Teel on May 9, 2013, they took three statements from him, and they took yet another on May 17, 2013. Collier's lawyer was able to get Teel to admit before the jury that in each of the first three statements his story

6

Scan 8 12/13/2017

included at least one material falsehood. In the first interview, he denied all involvement in the crimes. *Id.* at 148; see also trial exhibit DM-1 (transcribed statements of Teel taken May 9, 2013). In the second statement, he admitted lying about not being involved, *id.* at 152-53, and told the detectives that he carried out the crimes with Freeman and appellant, but no one else, *id.* at 153. In the third statement of May 9th, Teel again admitted he had lied in the previous interview, and for the first time told the detectives that a fourth man had been involved. *Id.* at 153-55. He did not state that Miller was that man, and to the contrary, he intentionally and falsely identified another person as the fourth man. *Id.* at 155-56. That testimony was consistent with other inconsistencies elicited by trial counsel for co-defendant Miller, who established that Teel's prior statements to police were inconsistent with his trial testimony in regard to how long he had known Miller prior to the robbery, kidnapping and murder, *id.* at 142-43, and in regard to Miller's role in taking Borowy from his home to Freeman's car, *id.* at 145-46. Teel also testified that he did not carry a gun during the home invasion, *id.* at 160, which was inconsistent with the testimony of Lewis Scott, who told the jury that Teel and appellant both brandished handguns when they confronted him in the Borowy home, *id.* at 72-74.

Although the inconsistencies in Teel's narrative were relevant to his credibility generally, they did not directly exculpate appellant, as they

7

pertained to the question whether Miller was involved. Teel consistently told investigators and the jury that appellant participated in the robbery, kidnapping and murder. That fact supports the conclusion that Teel accurately remembered the offenses and gave accurate testimony in court. In particular, it supports the conclusion that Teel accurately recalled the facts regarding appellant's participation. Moreover, the inconsistencies in Teel's prior statements support the conclusion that he was competent to tesitify because he realized that the facts, as he accurately recalled them, incriminated him.

## B. Copious evidence indicated appellant planned and participated in the robbery, kidnapping and murder

The Commonwealth produced evidence that corroborated Teel's testimony and further supported the guilty verdicts: (1) testimony of unbiased witnesses who implicated appellant; (2) circumstantial evidence of appellant's consciousness of guilt; and (3) cellular telephone evidence supporting an inference that appellant was in communication with the co-conspirators who were inside the Borowy home at the time of the robbery, and that appellant and his co-conspirators were in the general areas of the robbery and the murder at the approximate time each took place. Appellant produced evidence that supported an inference that he was not at the scene of the murder at the time it took place, but that evidence did not exclude the possibility that he was present.

8

scan 8 12/13/2017

## 1.   Unbiased witnesses implicated appellant in the robbery

Three witnesses testified that appellant, Teel, Freeman and Miller planned the robbery while at the King Street apartment, before leaving to carry out their plot. *See* N.T. 4-16-2014 at 236-42 (testimony of Amaris Acevedo, friend of sister of Reese's girlfriend); *id.* at 268-69 (testimony of Shaqeata Simmons, sister of Reese's girlfriend); *id.* at 190-94 (testimony of Reese). Garrison Brown testified that on the night before the murder, appellant said he was broke and asked him for money. N.T. 4-17-2014, pp. 23-24. Brown refused his request. *Id.* at 24. Only hours after the murder, appellant took Janae Nixon (his paramour, and the mother of his child) to dinner and paid cash. *Id.* at 115-17. Although appellant did not use credit cards and always paid cash, *id.* at 121-22, the jury was free to view his possession of the cash as circumstantial evidence that he received a share of the money taken from Borowy in return for his role in the robbery. Ms. Nixon also testified she owned a gray Buick LeSabre, and that appellant was driving it on the day of the murder. *Id.* at 114-15.

## 2.   Circumstantial evidence indicated appellant's consciousness of guilt

Evidence of flight or concealment may constitute circumstantial evidence of consciousness of guilt. *Commonwealth v. Housman*, 986 A.2d 822, 831 (Pa. 2009). Ms. Nixon testified that on May 10, 2013, appellant was at her house in Pottstown when detectives arrived to question appellant. N.T. 4-17-2014, pp.

9

Scan 8 12/13/2017

105-110. The next day, appellant asked Garrison Brown, who owned an auto repair shop in Philadelphia, to clean the inside of the Buick LeSabre, but not the outside. *Id.* at 14-18. Although the jury heard Ms. Nixon testify that she and appellant bought and sold cars to earn income, and that they bought the LeSabre for that purpose, *id.* at 120, one could still infer that appellant had the interior of the car cleaned in order to destroy evidence of the kidnapping and murder, and the jury was free to make that inference.

Ms. Nixon testified that appellant owned two cellular telephones at the time of the murder. *Id.* at 106. When detectives arrived to question appellant on May 10th, the phones lay in the living room, but when the police asked her to help locate them, she dialed their numbers and discovered them ringing in the trash can in her kitchen. *Id.* at 113-14; see also N.T. 4-18-2014, pp. 22-23 (testimony of Montgomery County Detective Todd Richard). When interviewed by Montgomery County Detective Mark Minzola on May 10th, appellant told him that his cell phone was "on the couch or the table or even upstairs in the bathroom." N.T. 4-18-2014, p. 143.

Appellant also told Detective Minzola that he was with a friend named Carley Kulp on the afternoon of May 5, 2013, *id.* at 142-43. Ms. Kulp appeared as a trial witness and testified that she knew appellant, but as of May 5, 2013, their relationship was limited to one thing: she bought narcotic pills from him. *Id.* at 142. She asked him to deliver some to her that day, but he never

10

arrived, N.T. 4-17-2014, pp. 134-36.

Appellant argued that he may have wanted to hide his telephones from the police because they contained evidence that he was selling drugs, but one must then ask why he would attempt to use Ms. Kulp as an alibi for his whereabouts specifically on the afternoon of the robbery, kidnapping and murder, because their relationship was limited to the buying and selling of drugs. One might instead infer that he put his cell phones in the trash and lied to the police about their whereabouts for the same reason he lied to the police about being with Ms. Kulp: to conceal his role in the robbery, kidnapping and murder. The jury was free to make that inference.

Appellant also told Detective Minzola that he knew co-defendant Collier, but not well. N.T. 4-18-2014, p. 147. Detective Minzola testified that a cell phone belonging to appellant stored a "contact" consisting of co-defendant Collier's nickname ("Dre"). N.T. 4-18-2014, pp. 106-07. Janae Nixon testified that she saw appellant and Collier "[h]anging out every now and then." N.T. 4-17-2014, p. 107. The jury was able to infer from that evidence that appellant tried to conceal his relationship with Collier because he knew that the truth would implicate him in the robbery, kidnapping and murder.

## 3. Cellular telephone evidence inculpated appellant

Records kept by the wireless service providers showed that appellant made and received numerous calls to and from co-defendants Collier and Miller

11

during and in the hours immediately following the robbery, kidnapping and murder. N.T. 4-18-2014, pp. 117-24. The jury also heard the testimony of Corporal Joseph Coffman, a police officer serving the Falls Township Police Department of Bucks County. Corporal Coffman was qualified to give expert testimony on the subject of cellular telephone networks and cellular telephone technology. N.T. 4-17-2014, p. 236. Corporal Coffman testified that appellant's cell phone was in close proximity to the Borowy home during the time of the robbery and in close proximity to the place Kareem Borowy was murdered around the time the murder occurred. *Id.* at 259-60. He also gave testimony, accompanied by a computer-generated, animated map, that appellant's cell phone transmitted and received signals to cell-phone towers near the scenes of the crimes during and after the robbery, kidnapping and murder, and then transmitted and received signals from a series of towers located ever-closer to Philadelphia. *Id.* at 248-56. Corporal Coffman's testimony supplied circumstantial evidence that appellant participated in the crimes and then fled to Philadelphia and temporarily concealed the gray LeSabre there, which was consistent with Garrison Brown's testimony that appellant dropped the gray LeSabre off at his automotive shop in Philadelphia on the afternoon of Sunday, May 5, 2013, the day of the robbery, kidnapping and murder. N.T. 4-17-2014, pp. 7-11.

## 4. Defendant's evidence did not exclude the possibility that he was present at the scenes of the crimes

At 2:26 on the afternoon of May 5, 2013, Linda Morgan called 911 to report a man—Kareem Borowy—lying on the roadside. By 2:29 Borowy was dead, and the forensic medical testimony indicated he lived for five to ten minutes, possibly longer or shorter, after having been shot. It is possible, but not likely, that the shooting occurred as late as 2:26, assuming the shooter drove off only a moment before Ms. Morgan passed by the scene and Borowy lived for less than three minutes afterward. Assuming he died the instant after Linda Morgan called 911, he could have been shot as early as 2:16, and there is a chance he may have been shot slightly earlier if he survived for more than ten minutes after having been shot.

At 2:28, a security camera at a Wawa convenience store at 1520 High Street in Pottstown recorded appellant driving the LeSabre into the parking lot. *Id.* at 190-91. Appellant produced the testimony of a private investigator, Richard L. Peffall, who testified that he drove from Sanatoga Station Road to the apartment at 553 King Street on a Sunday afternoon, and determined that the distance was approximately two miles, the route included eight traffic lights, and the transit time was seven minutes. *Id.* at 62-63. On the same afternoon he drove from the apartment to the convenience store and determined that the distance was 0.7 miles, the route included two traffic lights, and the transit time was three minutes. Based on Detective Peffall's

13

testimony, appellant could have driven from Sanatoga Station Road to the apartment on King Street, and then to the convenience store, in as little as ten minutes.

### III. Discussion

### A. The undersigned properly denied Appellant an evidentiary hearing

A judge must promptly review a petition for post-conviction collateral relief, and if there are no genuine issues concerning any material fact, and if the petitioner is not entitled to relief, then the judge may deny the petition without a hearing after giving the petitioner notice and an opportunity to respond. Pa.R.Crim.P. 907(1). "A PCRA hearing is not a matter of right, and the PCRA court may decline to hold a hearing if there is no genuine issue concerning any material fact and the defendant is not entitled to relief as a matter of law." *Commonwealth v. Morrison*, 878 A.2d 102, 109 (Pa. Super. Ct. 2005).

The discussion below will show that appellant was not entitled to a hearing on either of his two grounds for relief. In regard to the discovery claim, the amended petition averred a fact that negated appellant's right to relief. Therefore, petitioner was not entitled to a hearing on the discovery claim. In regard to the ineffective assistance of counsel claim, the undersigned assumed, for the sake of evaluating the claim, that the underlying claim is of arguable merit and counsel had no reasonable strategic basis for his or her action or

14

inaction. Therefore the only material fact to be determined was whether petitioner sustained prejudice as a consequence of his lawyer's alleged failure to suppress Teel's testimony. The trial record was sufficient to support the conclusion that he sustained no prejudice. Therefore, petitioner was not entitled to a hearing on the ineffective assistance of counsel claim.

**B.** **The undersigned properly denied petitioner's claim for relief based on his allegation that the prosecutors violated his right to pretrial discovery of Rasheed Teel's history of brain injury from a gunshot wound to his head, which wound allegedly rendered him incompetent to testify at trial**

In regard to the discovery claim, petitioner "must show that: (1) the prosecution concealed evidence; (2) which was either exculpatory evidence or impeachment evidence favorable to him; and (3) he was prejudiced by the concealment." *Commonwealth v. Simpson*, 66 A.3d 253, 264 (Pa. 2013). A petitioner cannot prove the first element if the evidence in question was equally available to him, for the prosecution cannot conceal that which is available to the petitioner. "*Brady* evidence...cannot have been equally available to the defense...." *Id.* (citing *Commonwealth v. Spotz*, 756 A.2d 1139, 1154 (Pa. 2000)).

In this case, there is no issue as to whether the prosecutors concealed the evidence of Teel's gunshot wound to the head, or that evidence was equally available to petitioner and Mr. Ennis. Petitioner has averred in his amended PCRA petition that he told Mr. Ennis about Teel's injury prior to trial. See

15

amended PCRA petition, ¶¶ 17(a), (b). Therefore, it cannot be true that the prosecutors concealed that fact from petitioner or his trial lawyer. It must be true that the evidence was equally available to both sides. Consequently, petitioner cannot plead a *prima facie Brady* claim. *See Simpson* at 265 (concluding the petitioner failed to plead *Brady* claim pertaining to victim's criminal history because, *inter alia*, the petitioner was aware of it).

**C.    The undersigned properly denied petitioner's claim for relief based on his allegation that trial counsel rendered ineffective assistance because he failed to establish that eyewitness Rasheed Teel was incompetent to testify at trial**

Claims of ineffective assistance of counsel ordinarily require a petitioner to prove that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) the ineffectiveness of counsel caused him prejudice, i.e., if not for counsel's ineffectiveness, there is a reasonable probability that the outcome of the trial would have been different. *Commonwealth v. Millward*, 830 A.2d 991, 994 (Pa. Super. Ct. 2003). Counsel is presumed to have been effective, and defendants bear the burden of proving otherwise. *Id.* If the underlying claim lacks arguable merit, then appellant cannot prove the second and third elements, hence the claim of ineffective assistance fails. "Counsel will not be deemed ineffective for failing to raise a meritless claim." *Commonwealth v. Jones*, 912 A.2d 268, 278 (Pa. 2006). Whatever might be the merits of the first two elements, petitioner cannot prove the third, prejudice. Assuming, *arguendo*,

16

that Teel had never testified because he had been determined to be incompetent before the trial began, the undersigned concludes that the other evidence of record was both sufficient and persuasive enough that there is no reasonable probability the outcome of the trial would have been different.

Since the conclusion of the preliminary hearing, the undersigned has presided over all of the proceedings in this case, including the trial and direct appeal. As was noted in the trial court opinion on direct appeal, in response to petitioner's claim that the verdict was against the weight of evidence, the prosecutors produced evidence that established, independent of Teel's testimony, facts that supported the guilty verdicts. Tr.Op. pp. 14-19. That evidence included: (1) testimony of witnesses who saw appellant planning the robbery on Sunday, May 5, 2013, or who supplied circumstantial evidence that he obtained cash as a result of his participation in the robbery; (2) circumstantial evidence of appellant's consciousness of guilt; and (3) cellular telephone evidence supporting an inference that appellant was in communication with the co-conspirators who were inside the Borowy home at the time of the burglary on Sunday, May 5, 2013, and that appellant and his co-conspirators were in the general areas of the burglary and the murder at the approximate time each took place. *Id.* at 14-18.

Appellants planned to rob Kareem Borowy by burglarizing his home, but during the course of committing those offenses they also kidnapped him and

17

shot him to death when he tried to flee. Three witnesses, Amaris Acevedo, Shaqeata Simmons and James Reese, testified that appellant and co-conspirators Teel, Freeman and Miller planned the burglary and carried out their plot. Garrison Brown testified that on the night before the murder, appellant said he was broke and asked him for money, but Brown refused his request. Only hours after the murder, appellant took Janae Nixon (petitioner's paramour, and the mother of his child) to dinner and paid cash. Although appellant did not use credit cards and always paid cash, the jury was free to view his possession of the cash as circumstantial evidence that he received a share of money stolen from Borowy in return for his role in the robbery.

Evidence of flight or concealment may constitute circumstantial evidence of consciousness of guilt. *Commonwealth v. Housman*, 986 A.2d 822, 831 (Pa. 2009). Ms. Nixon testified that on May 10, 2013, appellant was at her house in Pottstown when detectives arrived to question appellant. Ms. Nixon testified that appellant owned two cellular telephones at the time of the murder. When the detectives arrived, Ms. Nixon had last seen the phones in the living room, but when the police asked her to help locate them, they were no longer there; so she dialed their numbers and discovered them ringing in the trash can in her kitchen. When interviewed by Montgomery County Detective Mark Minzola on May 10th, appellant told him that his cell phone was on the couch, or the table, or the bathroom. Appellant also told Detective Minzola that he knew co-

18

defendant Collier, but not well. Detective Minzola testified that a cell phone belonging to appellant stored a contact consisting of co-defendant Collier's nickname ("Dre"). Janae Nixon testified that she saw appellant and Collier "[h]anging out every now and then." The jury was able to infer from that evidence that appellant tried to conceal his relationship with Collier because he knew that the truth would implicate him in the robbery, burglary, kidnapping and murder.

Ms. Nixon also testified she owned a gray Buick LeSabre, and that appellant was driving it on the day of the murder. On May 11, 2013, the day after detectives arrived at her home to question petitioner about his possible involvement in the murder, appellant asked Garrison Brown, who owned an auto repair shop in Philadelphia, to clean the inside of the Buick LeSabre, but not the outside. Although the jury heard Ms. Nixon testify that she and appellant bought and sold cars to earn income, and that they bought the LeSabre for that purpose, one could still infer that appellant had the interior of the car cleaned in order to destroy evidence of the kidnapping and murder, and the jury was free to make that inference.

Appellant told Detective Mark Minzola that he was with Carley Kulp on the afternoon of the murder, May 5, 2013. Ms. Kulp appeared as a trial witness and testified that she knew appellant. She asked him to meet her on the day of the murder to complete a drug deal, but he never arrived.

19

Records kept by the wireless service providers showed that appellant made and received numerous calls to and from co-defendants Collier and Miller during and in the hours immediately following the burglary, kidnapping and murder. The jury also heard the expert opinion testimony of Corporal Joseph Coffman, on the subject of cellular telephone networks and cellular telephone technology. Corporal Coffman testified that appellant's cell phone was in close proximity to the Borowy home during the time of the burglary and in close proximity to the place Kareem Borowy was murdered around the time of the murder. He also gave testimony, augmented by a computer-generated, animated map, that appellant's cell phone transmitted and received signals to cell-phone towers near the scenes of the crimes during and after the robbery, kidnapping and murder, and then transmitted and received signals from a series of towers located ever-closer to Philadelphia. Corporal Coffman's testimony supplied circumstantial evidence that appellant participated in the crimes and then fled to Philadelphia and temporarily concealed the gray LeSabre there, which corroborated Garrison Brown's testimony that appellant dropped the gray LeSabre off at his automotive shop in Philadelphia on the afternoon of Sunday, May 5, 2013, the day of the robbery, kidnapping and murder.

Appellant produced evidence that supported an inference he was not at the scene of the murder at the time it took place, but that evidence did not

20

exclude the opposite possibility. The trial evidence suggested that Borowy may have been shot on Sanatoga Station Road as early as 2:16 p.m. on Sunday, May 5, 2012, possibly even a few minutes earlier. Appellant's evidence allowed the possibility that he had been at Sanatoga Station Road as late as 2:18 p.m., thus giving the jurors evidence to conclude that petitioner did not leave the murder scene until after the fatal gunshot.

The jurors heard the testimony of Linda Morgan, the last person who saw Borowy alive, while he was lying in the weeds by side of Sanatoga Station Road crying for help. She reported the circumstance to the police immediately, at approximately 2:26 p.m. Lower Pottsgrove Township Detective Daniel Kienle testified that he was dispatched and arrived at the scene at 2:29 p.m. Detective Kienle found no pulse. Walter Hofman, M.D., an expert witness in forensic pathology, testified that Borowy died by the roadside, having bled to death from a gunshot wound that entered his back and struck his liver and a kidney. Dr. Hofman estimated that Borowy lived for five to ten minutes after having sustained the gunshot wound, although that time frame could have been slightly longer or shorter. It is possible Borowy died almost immediately after Ms. Morgan saw him at 2:26, after bleeding for ten minutes, thus establishing 2:16 as approximately the earliest possible time of the shooting.

At 2:28 p.m., a security camera at a Wawa convenience store at 1520 High Street in Pottstown recorded appellant driving the LeSabre into the

21

parking lot. Appellant produced the testimony of a private investigator, Richard L. Peffall, who testified that he drove from Sanatoga Station Road to the apartment at 553 King Street on a Sunday afternoon, and determined that the transit time was seven minutes. On the same afternoon he drove from the apartment to the convenience store and determined that the transit time was three minutes. Based on Detective Peffall's testimony, appellant could have driven from Sanatoga Station Road to the apartment on King Street, and then to the convenience store, in as little as ten minutes, meaning that he could have been present at the scene of the murder as late as 2:18.

In petitioner's trial, the undersigned became familiar with the reactions of the jurors from the time of jury voir dire through the reception of evidence to their return of the verdict. Based upon this personal knowledge as to this specific trial and these specific jurors, and with the experience of having tried numerous other murder trials as a judge and prosecutor, the undersigned concludes that there is no reasonable probability that the outcome of the trial would have been different if Teel had not testified.

22

## CONCLUSION

Upon consideration of the foregoing discussion, the undersigned respectfully submits that the order denying appellant's counseled, amended petition for post-conviction collateral relief should be affirmed.

BY THE COURT,

_____
Wendy Demchick-Alloy, Judge

**Copy of above sent on** _12/13/17_ **to:**
Patrick J. McMenamin, Esquire; McMenamin & Margiotti; 2307 N. Broad Street; P.O. Box 180; Lansdale, PA 19446; by first-class mail
Robert M. Falin, Deputy District Attorney, Appellate Division, by inter-office mail

23